# FOSHEE & TURNER COURT REPORTERS

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF ALABAMA

 3                      NORTHERN DIVISION

 4

 5     LORA RAE SEAMON,

 6          Plaintiff,              ORIGINAL

 7

 8     vs.          CIVIL ACTION NO. 2:05-cv-00486-T

 9

10     ALABAMA FAMILY PRACTICE,

11          Defendant.

12

13

14              *    *    *    *    *    *

15          DEPOSITION OF KATHY LYNDSEY, M.D.,

16     taken pursuant to notice and stipulation on

17     behalf of the Plaintiff, at Rushton,

18     Stakely, Johnston, & Garrett, 184 Commerce

19     Street, Montgomery, Alabama, before

20     Bridgette Mitchell, Shorthand Reporter and

21     Notary Public in and for the State of

22     Alabama at Large, on October 12, 2005,

23     commencing at 9:05 a.m.
```

EXHIBIT

1

## FOSHEE & TURNER COURT REPORTERS

9

1 Q.   Okay.  Let's change gears for a moment and
2      let's talk a minute about your current
3      practice.  And you're practicing here in
4      Montgomery; is that right?
5 A.   Correct.
6 Q.   What is the name of your practice?
7 A.   Alabama Family Practice.
8 Q.   And are you a shareholder in that business?
9 A.   Yes.
10 Q.   Are you the primary shareholder in that
11      business?
12 A.   Yes.
13 Q.   Okay.  Are there other shareholders in that
14      business?
15 A.   Yes.
16 Q.   Okay.  What percentage of the ownership of
17      this business do you have?
18 A.   One-third.
19 Q.   One-third?  Okay.  And who has the other
20      two-thirds?
21 A.   Dr. Mark Lyndsey and Dr. Ryan McWhorter.
22 Q.   Mark Lyndsey any relationship to you?
23 A.   Yes.

# FOSHEE & TURNER COURT REPORTERS

10

1 Q.  I'll assume he's your husband?

2 A.  Yes.

3 Q.  Okay.  Do either of these shareholders have

4     any, to your knowledge, training or

5     experience in employment issues?

6 A.  Yes.

7 Q.  Okay.  If you can, to the best of your

8     knowledge, tell me what knowledge and

9     experience you believe they have.

10 A.  We all attended the same residency program

11     and received the same training.

12 Q.  Okay.  So to the best of your knowledge,

13     they would have been trained in the same way

14     that you have described that you were

15     trained?

16 A.  Yes.

17 Q.  Okay.  At American Family Practice -- I'm

18     sorry -- Alabama Family Practice, when was

19     this business begun?

20 A.  May of '96.

21 Q.  All right.  And is it incorporated?

22 A.  Yes.

23 Q.  Okay.  Registered with the secretary of

## FOSHEE & TURNER COURT REPORTERS

15

```
 1     position for which the plaintiff, Lora

 2     Seamon, was hired?

 3 A.  Yes.

 4 Q.  Okay.  And I note that the person

 5     responsible for the file clerk is the office

 6     manager; is that correct?

 7 A.  Yes.

 8 Q.  Okay.  At the time that Lora Seamon was

 9     hired as an employee of your practice, who

10     was your office manager?

11 A.  I -- I am.

12 Q.  You are the office manager?  Okay.  And

13     there's a job summary suggested that the

14     file clerk be involved in several aspects of

15     the practice.  What exactly does that mean,

16     please?

17 A.  It says, Responsibilities are filing patient

18     charts, answering phones, scheduling

19     appointments, calling appointment reminders.

20 Q.  Anything else?

21 A.  And it says on No. 12, perform any other

22     task that's required by the office manager.

23 Q.  What other task might be required of a file
```

## FOSHEE & TURNER COURT REPORTERS

17

1 Q.　Typically, if you can tell us, what is the

2　　　size and weight of an individual patient

3　　　chart?

4 A.　It would vary on the number of pages in that

5　　　chart.

6 Q.　Okay.　From your experience from within your

7　　　practice both as a doctor and as the office

8　　　manager, could you tell me what you believe

9　　　the average weight to be of a patient's

10　　　chart?

11 A.　It's depending on -- I mean, they vary.

12　　　It's depending how many times the patient

13　　　comes in.　And we have over 12,000 patients,

14　　　so I don't -- I couldn't tell you the

15　　　average weight of each chart.

16 Q.　Okay.　But you do maintain a family

17　　　practice; is that correct?

18 A.　Yes.

19 Q.　Okay.　What exactly is entailed in a family

20　　　practice?

21 A.　It's taking care of the whole family.

22 Q.　Okay.　Do you do major surgeries?

23 A.　Do dermatological surgeries.

# FOSHEE & TURNER COURT REPORTERS

27

1      supplies that she needs to keep the charts

2      up.  She would notify the office manager

3      what was needed and we would place an order.

4 Q.  Okay.  Do you recall the time that Lora

5      Seamon spent at your office as an employee?

6 A.  Yes.

7 Q.  Do you remember the dates?

8 A.  Yes.

9 Q.  And what dates were they?

10 A.  She started on 12/6.

11 Q.  Okay.  And what day did she end her

12      employment?

13 A.  12/6.

14 Q.  Okay.  What time of day did she begin her

15      employment?

16 A.  I think she started about eight.

17 Q.  And what time of day did she terminate her

18      employment or was her employment terminated?

19 A.  Her employment wasn't terminated.  She left

20      approximately, about, two -- one, two.

21 Q.  Okay.  Well, that was my next question.  Did

22      you fire Lora Rae Seamon?

23 A.  No.

**FOSHEE & TURNER COURT REPORTERS**

28

1  Q.  Did anyone in your office fire Lora Rae

2      Seamon?

3  A.  No.

4  Q.  Okay.  Who in your office would have

5      authority to fire Lora Rae Seamon?

6  A.  I would.

7  Q.  Would anyone else?

8  A.  The other doctors could have.

9  Q.  Okay.  Would they have been required to seek

10     your approval prior to firing any employee

11     generally?

12 A.  Yes.

13 Q.  And you said Sharon Hayes works for you?

14 A.  Yes.

15 Q.  And what is her position?

16 A.  She's my office assistant.

17 Q.  Okay.  Does she have authority to hire and

18     fire?

19 A.  No.

20 Q.  Okay.  And it's your position that Lora Rae

21     Seamon left of her own volition and

22     terminated her employment with your practice

23     on December 6, 2004?

# FOSHEE & TURNER COURT REPORTERS

29

```
 1 A.   I felt it was a mutual agreement.

 2 Q.   A mutual agreement.  Can you describe for me

 3      what you mean by "mutual agreement"?

 4 A.   After we discussed the problems that she had

 5      had, she said that she had a five-pound

 6      weight restriction.  And I asked her would

 7      she be able to do her duties based upon

 8      that, could she, and she said -- kind of

 9      giggled and shrugged her shoulders and said

10      that -- no, and left.

11 Q.   And you understood that to mean --

12 A.   That she could not do her duties.

13 Q.   -- that she quit her position?

14 A.   That she agreed that she could not do the

15      duties and could no longer be employed

16      there, that she misunderstood the

17      requirement.

18 Q.   Did you have any conversations with Sharon

19      Hayes --

20 A.   Yes.

21 Q.   -- regarding Lora Seamon?

22 A.   Yes.

23 Q.   Okay.  Did you have more than one
```

## FOSHEE & TURNER COURT REPORTERS

30

1        conversation with Sharon Hayes regarding

2        Lora Seamon?

3 A.    Mainly just one prior to talking to her.

4 Q.    Okay.  When was the first conversation -- or

5        when was that conversation?  Excuse me.

6 A.    That morning while I was in my clinic,

7        Sharon came to me and told me that Lora was

8        having trouble in the file room filing

9        charts back.

10 Q.   Okay.  And what exactly did Ms. Hayes say to

11       you?

12 A.   She said that a coworker had told -- come to

13       Sharon and said that Lora had complained

14       that she was having trouble bending over

15       putting charts back and lifting them and she

16       felt like that her water would break.

17 Q.   Okay.  Did you know that Lora Rae Seamon was

18       pregnant on December 6, 2004?

19 A.   No.

20 Q.   Okay.  Did you have an opportunity to

21       observe Lora Rae Seamon on the morning of

22       December 6, 2004?

23 A.   Yes.

## FOSHEE & TURNER COURT REPORTERS

31

1 Q.  Was Lora Rae Seamon hired on December 6 --

2 A.  Yes.

3 Q.  -- 2004?

4 A.  Yes.

5 Q.  Okay.  Did she have an initial interview at

6     some point in time?

7 A.  Yes.

8 Q.  Was it that morning of the 6th?

9 A.  No.

10 Q.  Okay.  Do you know the date that she had her

11    initial interview?

12 A.  The 3rd.

13 Q.  The 3rd.  And who interviewed her?

14 A.  Sharon and myself.

15 Q.  Both of you together?

16 A.  Separately.

17 Q.  Separately.  Who interviewed her first?

18 A.  Sharon.

19 Q.  Okay.  And did you have an opportunity to

20    talk to Sharon about the interview that

21    Sharon had with Lora before you had your

22    opportunity to meet with Lora?

23 A.  Yes.

## FOSHEE & TURNER COURT REPORTERS

33

1 Q.  Okay.  When you first entered the room for

2       the interview, was Lora Rae Seamon already

3       there?

4 A.  Yes.

5 Q.  Was she standing or was she sitting?

6 A.  Sitting.

7 Q.  Was she at the table?

8 A.  Yes.

9 Q.  Okay.  Did you notice whether or not she was

10      pregnant?

11 A.  I didn't look.

12 Q.  Okay.  Did you inquire?

13 A.  No.

14 Q.  Okay.  Did you have any reason to believe

15      that she was pregnant?

16 A.  No.

17 Q.  All right.  Tell me about the substance of

18      the interview.

19 A.  When I interview any employee, I ask about

20      what their weaknesses and strengths are,

21      their extracurricular activities, if they're

22      able to do the job.  I describe in detail

23      what they'd have to do the day and kind of

## FOSHEE & TURNER COURT REPORTERS

38

1 A.   That's what's written.

2 Q.   Okay.  And Lora Rae Seamon was ultimately

3      hired.  What was she paid?

4 A.   Seven dollars an hour.

5 Q.   Okay.  Towards the middle -- bottom third of

6      the second page, there is a line that says,

7      Set up with doctors, question mark.  And

8      there's a line checked yes and then a blank

9      line no.  Do you know what that means?

10 A.  This is Sharon's way of saying this is an

11     applicant that they wanted -- that she

12     wanted the doctors to interview.

13 Q.  Okay.  And at the bottom of the second page

14     of Exhibit 3 there is what looks like a

15     signature that says S. Hayes.  Do you

16     recognize that?

17 A.  Yes.

18 Q.  Do you recognize that as being the signature

19     of Sharon Hayes?

20 A.  Yes.

21 Q.  Okay.  Who is Robin Harper?

22 A.  She's an employee.

23 Q.  Is she currently employed?

## FOSHEE & TURNER COURT REPORTERS

42

1 Q.   Now, do you have any explanation for why

2       there's a scratch over there?

3 A.   No.

4 Q.   Okay.  Changing gears for a second, talk to

5       me for a moment about what benefits are

6       generally provided your employees in your

7       practice?

8 A.   Okay.  We have vacation/sick that after the

9       six-month time that they're there that they

10      get half of their vacation, which would be a

11      total of ten days, and then half of their

12      sick, which would be total of seven; so half

13      of that is three and a half and half of the

14      other is five.  After their ninety-day

15      probationary period, they're eligible for --

16      to sign up for health benefits.

17 Q.   All right.

18 A.   They are -- we have ten paid holidays and

19      those are eligible after that probationary

20      period.  We provide workman's comp.  We have

21      a Christmas club plan that they can have so

22      much taken out of their check.  All those

23      benefits are eligible after that period of

## FOSHEE & TURNER COURT REPORTERS

43

1       time except for the health insurance which

2       they can sign up for after their

3       probationary period of three months.

4 Q.    Okay.  Describe what is entailed in this

5       ninety-day probationary period.

6 A.    The ninety-day probationary period entails

7       the time -- a period when an employee is

8       hired and the employer helps them get used

9       to their job.  If they have problems they go

10      over it with them, that type of thing.  And

11      at the end of the probationary period if

12      they're no longer needed, then, you know,

13      you discuss that at that time.

14 Q.   Okay.  And I'm sorry.  Health insurance --

15      when is health insurance available?

16 A.   They can sign up for it at the ninety days.

17      The other benefits are at the six-month

18      time.

19 Q.   All right.  So you can't get your vacation

20      until you -- after your six months?

21 A.   Six months, right.

22 Q.   And your sick and personal leave doesn't

23      accrue until after what period of time?

## FOSHEE & TURNER COURT REPORTERS

44

1 A.   The six months.

2 Q.   Okay.  I notice there's a profit-sharing

3      plan?

4 A.   We've had one before in the past and have a

5      *SEP presently -- 401(k) in the past and a

6      *SEP presently.

7 Q.   Okay.  And I note from Plaintiff's Exhibit 4

8      that the box is checked at the top there,

9      full-time in the position of file clerk.  Do

10     you agree with that?

11 A.  That is checked in that spot.

12 Q.  Okay.  What does "full-time" mean to you?

13 A.  Full-time is someone that's going to work

14     eight to five.

15 Q.  Is that forty hours --

16 A.  Uh-huh.

17 Q.  Okay.  And did you have a position open at

18     that time for a full-time file clerk?

19 A.  Yes.

20 Q.  Okay.  And is there room for advancement or

21     for promotion for employees within your

22     practice?

23 A.  Yes.

## FOSHEE & TURNER COURT REPORTERS

51

1 Q.   In December of 2004, how many temporary

2       thirty-day employees did you have working at

3       your office?

4 A.   In December of 2004?

5 Q.   Exclusive of Lora Rae Seamon.

6 A.   Any new person that we hire goes through a

7       thirty-day temporary, and I don't recall any

8       new hires within that period of time.  I'd

9       have to look back at my employment files.

10      But anyone that is hired is thirty-day

11      initially.

12 Q.  Every new employee that you hire is a

13      thirty-day temporary employee?

14 A.  Yes.

15 Q.  Okay.  Why is that?

16 A.  To help them get used to the surroundings,

17      make sure they're going to feel like they

18      fit in, and just make sure they're going to

19      be able to do the job in that period of time

20      so that if they can't then they can part and

21      not have any problems with it.

22 Q.  What would the purpose of the ninety-day

23      probationary period be if you already have

# FOSHEE & TURNER COURT REPORTERS

57

1    Seamon, did Sharon Hayes make any statements

2    to you regarding Kristin Thomas?

3 A.  Repeat your question.

4 Q.  Referring to the conversation that you had

5    on December 6, 2004, with Sharon Hayes, the

6    one we've discussed earlier in this

7    deposition, was there any mention of Kristin

8    Thomas in that conversation, if you recall?

9 A.  Yes.

10 Q.  What specifically was stated regarding

11    Kristin Thomas?

12 A.  Sharon came to me and told me that Kristin

13    was concerned that Lora had made some

14    statements to her about her difficulties

15    lifting charts and was scared that her water

16    would break and if anything happened to take

17    her to the hospital.

18 Q.  Okay.  Did you take the opportunity to talk

19    to Kristin Thomas on December 6, before Lora

20    Rae Seamon and you had your conversation?

21 A.  No.

22 Q.  Okay.  Who is Stephanie Treywick?

23 A.  She's an employee.

## FOSHEE & TURNER COURT REPORTERS

62

1    employment?

2 A.  Yes.

3 Q.  Okay.  Did Lora Rae Seamon ever indicate to

4    you that she had a statement from her

5    physician regarding her ability to lift

6    heavy objects or weights over a certain

7    restriction?

8 A.  She indicated she had a restriction from her

9    OB.

10 Q.  Did she provide you with any documentation

11    regarding that restriction?

12 A.  No.

13 Q.  Okay.  And is it your testimony today that

14    Lora Rae Seamon voluntarily quit her

15    employment with your practice?

16 A.  My statement is that it was a mutual

17    agreement that she could not perform her job

18    duties and the separation was a mutual

19    agreement.

20 Q.  So you agreed that she could not perform her

21    job duties?

22 A.  She told me she had the five-pound

23    restriction and I told her I needed her to

# FOSHEE & TURNER COURT REPORTERS

63

1     be able to lift stacks of charts that

2     weighed ten to fifteen pounds and she said

3     she couldn't do it.

4 Q.   Okay.  Why is it necessary for her to lift

5     charts or stacks of charts that weigh ten to

6     fifteen pounds?

7 A.   In order for the doctors to get their

8     correspondence and messages timely on the

9     patient in order to get back with them in

10    the same day as our information comes

11    through.

12 Q.  Do you see that cart right there

13    (indicating)?

14 A.  Yes.

15 Q.  It's a four-wheeled cart with shelves, flat

16    surfaces on them; correct?

17 A.  Yes.

18 Q.  Do you have any such types of cart in your

19    office?

20 A.  Yes.

21 Q.  Do you use them to carry files?

22 A.  Yes.

23 Q.  Is it absolutely -- excuse me.  Is it