# FOSHEE & TURNER COURT REPORTERS

1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3                NORTHERN DIVISION

4

5    LORA RAE SEAMON,                    COPY

6            Plaintiff,

7

8    vs.            CIVIL ACTION NO. 2:05-cv-00486-T

9

10   ALABAMA FAMILY PRACTICE,

11           Defendant.

12

13

14            *    *    *    *    *    *

15        **DEPOSITION OF SHARON HAYES**, taken

16   pursuant to notice and stipulation on behalf

17   of the Plaintiff, at Rushton, Stakely,

18   Johnston, & Garrett, 184 Commerce Street,

19   Montgomery, Alabama, before Bridgette

20   Mitchell, Shorthand Reporter and Notary

21   Public in and for the State of Alabama at

22   Large, on October 12, 2005, commencing at

23   10:45 a.m.

EXHIBIT
2

## FOSHEE & TURNER COURT REPORTERS

8

1 A.   Oh, that's fine.  So I need to not just say

2      my grandmother, I need to say her name?

3 Q.   Yeah.

4 A.   Okay.  I just wanted to clarify.  Mary Ann

5      Vines, David Vines, Barbara Vines, Wilma

6      Vines.  I guess my mother-in-law, Dorothy

7      Hayes, Eddie Hayes, Alene Ray, and Russell

8      Ray.

9 Q.   Okay.  Do you remember December 3, 2004?

10 A.   Yes, I do.

11 Q.   Do you remember -- did you meet Lora Seamon

12      on that day?

13 A.   Yes.

14 Q.   Okay.  Do you remember what time of day it

15      was when you first met her?

16 A.   Midmorning.

17 Q.   Okay.  Is that the first time in your life,

18      to the best of your knowledge, that you met

19      Lora Seamon?

20 A.   Yes.

21 Q.   Had she come in for an interview?

22 A.   Yes.

23 Q.   And that's an interview for a position of

## FOSHEE & TURNER COURT REPORTERS

9

1     employment; is that correct?

2 A.   Yes.

3 Q.   All right.  And was this a pre-arranged

4     meeting?

5 A.   She had an appointment.

6 Q.   She didn't just walk in off the street?

7 A.   Correct.

8 Q.   Did you have a position open that needed

9     filling?

10 A.   Yes.

11 Q.   Okay.  What position was that?

12 A.   File clerk.

13 Q.   All right.  And did you have an opportunity

14    to interview Lora Seamon for that position?

15 A.   Yes.

16 Q.   Okay.  Tell me about the interview.

17 A.   I have a standard list of questions --

18 Q.   Okay.

19 A.   -- that I go over and I ask and I write down

20    their answers.

21 Q.   Okay.  I'm going to show you what's been

22    premarked as Plaintiff's Exhibit No. 3 and

23    ask you, is that the list of questions that

# FOSHEE & TURNER COURT REPORTERS

12

1 A.  Repeat the question.

2 Q.  During the course of this interview, did she

3      indicate to you at any time that she could

4      not lift any objects over five or ten

5      pounds?

6 A.  No.

7 Q.  All right.  Excuse me.  But do you remember

8      what day of the week the 3rd was?

9 A.  I believe it was a Friday.  I think.

10 Q.  Okay.  And then the 6th would be the

11      following Monday?

12 A.  Yes, sir.

13 Q.  Okay.  And you hired -- excuse me.  Lora Rae

14      Seamon was hired and scheduled to begin work

15      that following Monday?

16 A.  Yes.

17 Q.  Okay.  And what time was she supposed to

18      show up for work that following Monday?

19 A.  I believe it was eight o'clock.

20 Q.  And that's December 6?

21 A.  Yes.

22 Q.  Okay.  In the response that you wrote to

23      Question No. 7 on Exhibit No. 3, it says,

## FOSHEE & TURNER COURT REPORTERS

13

1    Does not foresee needing time off. What did

2    that mean to you or what does that mean to

3    you?

4 A.   That she doesn't need any time off.

5 Q.   Okay. Why would it be important for her to

6    state that there would be no need for her to

7    have time off?

8 A.   I also do the scheduling for the

9    employees --

10 Q.   Okay.

11 A.   -- people needing time off, vacations. We

12    were getting into a holiday month and a lot

13    of people take time off, and I needed to

14    know if we would have adequate coverage for

15    the office.

16 Q.   Okay. At the time that you were performing

17    this interview on December 3, were you aware

18    that Lora Rae Seamon was pregnant?

19 A.   No, sir.

20 Q.   Did you have an opportunity to see her

21    standing?

22 A.   Yes.

23 Q.   Did you have an opportunity to see her

## FOSHEE & TURNER COURT REPORTERS

18

1 Q.   There's a section in the middle of the

2      exhibit that states benefits provided.   Do

3      you see that?

4 A.   Yes.

5 Q.   Health insurance is checked; is that

6      correct?

7 A.   Yes.

8 Q.   Is health insurance available for all

9      full-time employees of the practice?

10 A.   After their probationary period, yes.

11 Q.   And what is the probationary period?

12 A.   Ninety days.

13 Q.   There's a check by the section indicating

14      sick/personal leave.   Do you see that?

15 A.   Yes.

16 Q.   Okay.   Did you make that check mark?

17 A.   Yes.

18 Q.   Does that indicate that Lora Seamon, as an

19      employee after a probationary period, would

20      be available for sick and personal leave?

21 A.   That one is after six months.

22 Q.   Okay.   So it indicates that after six

23      months, she would be available for personal

## FOSHEE & TURNER COURT REPORTERS

19

1     and sick leave; is that correct?

2 A.  That's what that means, yes.

3 Q.  There's a section for vacation that's been

4     X'd through.  Did you put that X there?

5 A.  I did.

6 Q.  Okay.  What does it mean that vacation would

7     be available as a benefit?

8 A.  After six months, you receive half, and you

9     receive the other half at a year.

10 Q.  Okay.  Under that there's a section for

11    holidays, and there's a blank that's filled

12    in with the number ten.  Explain for me what

13    that means, please.

14 A.  There's ten paid holidays throughout the

15    year and that would begin after your

16    ninety-day probation period.

17 Q.  All right.  There's a section under that for

18    profit-sharing plan; it's also checked.  Did

19    you make that check mark?

20 A.  I did.

21 Q.  And explain to me what profit-sharing plan

22    means.

23 A.  It would be a plan that the doctors offer.

## FOSHEE & TURNER COURT REPORTERS

20

1    I believe it's the SEP or SARP.  I'm not

2    sure which plan they're on now.  But that's

3    what that is.

4 Q.  All right.  Moving along, there's a check

5    next to the section stating workers'

6    compensation.  Is that your check mark?

7 A.  Yes.

8 Q.  And workers' compensation, was it provided

9    for Lora Seamon?

10 A.  It's provided for all employees.

11 Q.  And is that immediate?

12 A.  Yes.

13 Q.  Okay.  Lastly, there's a section that says

14    other benefits and it says in handwriting

15    Christmas Club.  Is that your handwriting?

16 A.  Yes.

17 Q.  Is that your check mark next to "other

18    benefits"?

19 A.  Yes.

20 Q.  What does the Christmas Club entail?

21 A.  If you would like to deduct so much out of

22    your paycheck to be put into a savings

23    account and then a check issued once a year

## FOSHEE & TURNER COURT REPORTERS

21

1       for our Christmas Club.

2 Q.    When does that benefit begin?

3 A.    After ninety days.

4 Q.    Okay.  I notice at the bottom that there's a

5       section that allows for an employee

6       signature, and Lora Seamon's signature is

7       there.  Now, do you recall Lora Seamon

8       giving her signature?

9 A.    I do.

10 Q.   Okay.  Also, next to that signature is the

11      date, which has been scratched through.  Do

12      you recall how or why there's a scratch mark

13      and a replacement of a number in that

14      particular area?

15 A.   No, sir.

16 Q.   Okay.  At the top right-hand corner of the

17      page in longhand there is a written section

18      that states, Thirty-day temporary.  There's

19      an X and a line.  Did you write in the

20      thirty-day temporary?

21 A.   I did.

22 Q.   Okay.  What was the purpose in doing that?

23 A.   Every employee is hired on a thirty-day

## FOSHEE & TURNER COURT REPORTERS

22

```
 1      temporary probationary status.

 2 Q.   All right.  When did you write thirty-day

 3      temporary on Exhibit 4?

 4 A.   On the day I filled out the form, which was

 5      December 6.

 6 Q.   All right.  And I think you'll agree with me

 7      that Exhibit 4 is a photocopy representation

 8      of this employment agreement; is that

 9      correct?

10 A.   Correct.

11 Q.   Where is the original kept?

12 A.   In a locked file cabinet.

13 Q.   Where?

14 A.   In the office manager's office.

15 Q.   And that's there at the practice?

16 A.   Correct.

17 Q.   Is that your office?

18 A.   No, sir.

19 Q.   Whose office is that?

20 A.   Dr. Kathy Lyndsey's.

21 Q.   Okay.  Thank you.  Are you familiar with

22      whether or not the practice maintains an

23      employee handbook or policy guide?
```

## FOSHEE & TURNER COURT REPORTERS

23

1 A.   Yes, I am.

2 Q.   Okay.  Is every employee given a copy of --

3      excuse me.  Is every employee given an

4      employee handbook?

5 A.   They're given a policy and procedure manual.

6 Q.   Okay.  I'm going to show you what's been

7      premarked Plaintiff's Exhibit No. 1 and ask

8      you to identify it.

9 A.   This is a page out of that policy and

10     procedure manual.

11 Q.  Does it indicate that it's the policy or

12     practice of the practice not to discriminate

13     against persons based on sex or disability?

14 A.  Yes.

15 Q.  Moving on to Plaintiff's Exhibit No. 2, I'll

16     ask you if you recognize that document?

17 A.  I do.

18 Q.  And describe it for me, please.

19 A.  It's a job description.

20 Q.  Is that part of the employee policy manual?

21 A.  Yes.

22 Q.  Okay.  Describe for me, in your opinion,

23     what is the job and responsibility of a file

## FOSHEE & TURNER COURT REPORTERS

24

1     clerk at the practice?

2 A.  To pull all charts for incoming

3     correspondence, lab work, messages, pull

4     charts for the next day, help assist with

5     the phones if necessary, to help assist with

6     the front office if necessary, to retrieve

7     charts and carry them to the locations and

8     then pick up charts.

9 Q.  Okay.  I'll refer you in Exhibit 2 to the

10    section that is styled or subtitled, Job

11    summary.  Do you see that?

12 A.  I do.

13 Q.  All right.  In the first line it states, The

14    file clerk will be involved with several

15    aspects of the practice.  Do you see that?

16 A.  I do.

17 Q.  What does that mean to you?

18 A.  That her duties would require her to do

19    several things throughout the practice.

20 Q.  What things specifically would you think

21    that that would refer to?

22 A.  That could be numerous.  I would have to

23    have a more specific question.

## FOSHEE & TURNER COURT REPORTERS

27

1 Q.   Name them.

2 A.   We -- there are daily close-outs that are

3      boxed up and --

4 Q.   Let me interrupt you.  The question was, in

5      the second sentence of the job summary

6      section of Exhibit 2 is the language,

7      Responsibilities are filing patient charts,

8      we'll call that No. 1; answering telephone,

9      we'll call that No. 2; scheduling

10     appointments, we'll call that No. 3; and

11     calling appointment reminders, we'll call

12     that No. 4.  Absent No. 1, filing patient

13     charts, of answering the telephone,

14     scheduling appointments, and calling

15     appointment reminders, are there any lifting

16     requirements?

17 A.  No.

18 Q.  Thank you.  Specific requirements is the

19     next section under job summary in Exhibit 2.

20     There's a list of twelve specific

21     requirements.  Do you see that?

22 A.  I do.

23 Q.  No. 3 states, Prepare new patient charts.

## FOSHEE & TURNER COURT REPORTERS

28

1    Do you see that?

2 A.  I do.

3 Q.  Do you consider that a heavy-lifting

4     requirement?

5 A.  In a sense, yes.

6 Q.  Describe for me how that's a heavy-lifting

7     requirement.

8 A.  Because you have to gather all your boxes of

9     tabs and the papers that put -- that are

10    required to be put in that new chart carried

11    to your location.  So in that sense I would

12    say yes.

13 Q.  Okay.  Would it be possible for a person

14    fulfilling the requirements of No. 3,

15    prepare new patient charts, to make several

16    trips with less than five pounds' worth of

17    materials necessary for preparing new

18    patient charts in preparing of new patient

19    charts?

20 A.  You could.  But the one box is going to

21    weigh over that of tabs.

22 Q.  Okay.  How much does a box of tabs weigh?

23 A.  I'm not sure exactly.

# FOSHEE & TURNER COURT REPORTERS

29

1 Q.  Where are the box of tabs kept?

2 A.  In a storage closet.

3 Q.  Where is that?

4 A.  At the other side of the office.

5 Q.  Okay.  Typically, how many new patient files

6      are required to be assembled at any one

7      time?

8 A.  We usually try to do five hundred.

9 Q.  Five hundred new patient files at one time?

10 A.  Yes, sir.

11 Q.  How many new patients do you get on a daily

12     basis on average?

13 A.  It varies.

14 Q.  On average.

15 A.  Each doctor could have anywhere from five to

16     seven a day.

17 Q.  Five to seven a day.  And do you wait until

18     you have a need -- do you wait until you

19     have five hundred new patients before you

20     start to open new files?

21 A.  I'm sorry?

22 Q.  You have three doctors working in the

23     office?

## FOSHEE & TURNER COURT REPORTERS

34

1      heavy lifting?

2 A.   If you finish the rest of No. 6 it does.

3 Q.   Answer my question.

4 A.   Answering phones and taking messages does

5      not require heavy lifting.

6 Q.   Now let's finish the sentence.  Pull charts

7      for messages taken.  Does that require heavy

8      lifting?

9 A.   It could.

10 Q.  Okay.  Describe heavy lifting in your mind

11     to me.  What does that mean to you?

12 A.  If a chart is heavy.

13 Q.  How heavy?

14 A.  I don't have a weight.  It just -- if a

15     chart is heavy.

16 Q.  Well, from your personal experience, what

17     would make a chart heavy?

18 A.  The paper in it.

19 Q.  How much paper do you think it would take to

20     make it heavy?

21 A.  A half an inch to an inch is heavy.

22 Q.  Half an inch to an inch.  Okay.  Are you

23     familiar with the Montgomery Yellow Pages

## FOSHEE & TURNER COURT REPORTERS

35

1    phone directory?

2 A.  I am.

3 Q.  Do you consider that heavy or not heavy?

4 A.  Heavy.

5 Q.  Okay.  No. 7, specific requirements,

6    Plaintiff's Exhibit No. 2, Schedule

7    appointments for patients.  Does that

8    involve any heavy lifting?

9 A.  No, sir.

10 Q.  All right.  Moving on to No. 8, Prepare mail

11    for mailing and ensure mail is taken to

12    mailbox daily.  Does that require any heavy

13    lifting?

14 A.  It could.

15 Q.  It could?  Okay.  Describe it.  What heavy

16    lifting would it involve?

17 A.  The basket that we put the mail in and

18    depending on how much correspondence was

19    going out and how much was being retrieved

20    from the mailbox.

21 Q.  Okay.  Have you ever taken an opportunity to

22    weigh the mailbox that you use to carry mail

23    in and out of your office?

# FOSHEE & TURNER COURT REPORTERS

36

1 A.  No, sir.

2 Q.  Okay.  No. 9, Assist in inventory of

3     supplies and ordering.  Does that require

4     any heavy lifting?

5 A.  No, sir.

6 Q.  No. 10, Sort mail daily to assure

7     distributed to proper location.  Does that

8     require any heavy lifting?

9 A.  It could.

10 Q.  Describe for me how it could involve some

11     heavy lifting.

12 A.  Just depending on the -- what was received

13     in the mail when it's delivered to the

14     doctors.

15 Q.  Have you ever had an opportunity to weigh

16     the mail that comes into the office?

17 A.  No, sir.

18 Q.  Did you ever have the opportunity to weigh

19     the mail that goes out of the office?

20 A.  No, sir.

21 Q.  If I say a person can make two trips, does

22     that have any meaning to you?

23 A.  No, sir.

# FOSHEE & TURNER COURT REPORTERS

38

1    you made more than one trip?

2 A.    Correct.

3 Q.    So do you now understand what I mean when I

4    say a person can make more than one trip?

5 A.    I understand that.

6 Q.    Okay.  If someone needed to take the mail

7    out and the basket was too heavy, would it

8    be possible for them to make two trips?

9 A.    Yes.

10 Q.    That way they would be taking less weight

11    each time; right?

12 A.    Yes.

13 Q.    No. 11 under specific requirements under

14    Exhibit No. 2 states, Open mail and log in

15    incoming checks on check log daily.  What

16    does that mean?

17 A.    Opening the mail, and any insurance checks

18    that come in, we have an incoming check log

19    sheet that those are to be written down on

20    individually.

21 Q.    Okay.  Does that require any heavy lifting?

22 A.    No.

23 Q.    No. 12 says, Perform other tasks as required

## FOSHEE & TURNER COURT REPORTERS

39

1    by office manager.  What kind of heavy-

2    lifting requirements could the office

3    manager require?

4 A.  The one that comes to mind is the boxes that

5    we take upstairs and retrieve from

6    downstairs, if the doctors need information

7    out of those boxes.

8 Q.  Okay.  Do you see the cart that's in this

9    room that's against the wall?

10 A.  I do.

11 Q.  I'll describe it as a metal cart with four

12    wheels and three shelves.  Do you have a

13    cart similar to that at your practice?

14 A.  We do.

15 Q.  Do you have more than one?

16 A.  We do.

17 Q.  What do you use them for?

18 A.  To help assist us with delivery and

19    gathering of charts.

20 Q.  Was that cart or those carts available for

21    Lora Seamon's use on December 6, 2004?

22 A.  They were.

23 Q.  Okay.  We're almost finished.  Did there

## FOSHEE & TURNER COURT REPORTERS

41

1      talking about?

2 A.   After lunch, a coworker had come to me

3      concerned about things that were -- that

4      Lora had said to her.

5 Q.   And what did this coworker convey to you?

6 A.   That Lora, when she would bend down to put a

7      chart back onto the shelf, that she would

8      grab her stomach and it was hurting her and

9      that if her water broke to take her to the

10     hospital.

11 Q.  Okay.  Did you have an opportunity to see

12     Lora Seamon that Monday morning before

13     lunch?

14 A.  I did.

15 Q.  Do you recall what she was wearing?

16 A.  I believe it was scrubs.

17 Q.  Scrubs?

18 A.  And a jacket.

19 Q.  Okay.  What color were the scrubs?

20 A.  I have no idea.

21 Q.  Are personnel in your employ there at the

22     practice required to wear scrubs?

23 A.  They're not required to wear them.

**FOSHEE & TURNER COURT REPORTERS**

43

1  A.   I don't own any and I think it looks

2       professional in my position to wear regular

3       dress clothes.

4  Q.   Okay.  So this morning of the 6th, Lora

5       Seamon was wearing scrubs and a jacket or

6       coat, you said?

7  A.   Correct.

8  Q.   Describe the coat.

9  A.   It looked like a lab coat that goes with

10      scrubs.

11 Q.   Okay.  Is it common for employees at the

12      practice to wear such coat?

13 A.   Yes, sir.

14 Q.   Okay.  Did you notice or recognize that

15      morning that Lora Seamon was pregnant?

16 A.   I did not.

17 Q.   Did she look fat to you?

18 A.   I couldn't tell.

19 Q.   Did she come to you and complain in any way

20      about the duties or responsibilities that

21      she had been given as a file clerk that

22      morning?

23 A.   No, sir.

## FOSHEE & TURNER COURT REPORTERS

44

1 Q.  Did she at any point in time on the 6th

2      complain to you about the duties and

3      responsibilities that she had been given as

4      a file clerk?

5 A.  No, sir.

6 Q.  Okay.  What is the name of this coemployee

7      who came and expressed concern over Lora

8      Seamon's complaints about her being

9      pregnant?

10 A.  Kristin Thomas.

11 Q.  Kristin Thomas.  Where is Kristin Thomas

12      today?

13 A.  I have no idea.

14 Q.  Is she employed with your office?

15 A.  No, sir.

16 Q.  When did she leave your employ?

17 A.  I'm not sure the exact date.  It was this

18      year.

19 Q.  Okay.  Do you know why she left your employ?

20 A.  She resigned.  I don't know why.

21 Q.  Was she pregnant?

22 A.  Not to my knowledge.

23 Q.  All right.  What did you do when Kristin

## FOSHEE & TURNER COURT REPORTERS

45

1       Thomas came to you and expressed these

2       concerns about Lora Rae Seamon?

3 A.    I went to Dr. Kathy Lyndsey.

4 Q.    All right.  Was that an immediate response?

5 A.    It was.

6 Q.    Okay.  And what did you tell Dr. Lyndsey?

7 A.    I told her what Kristin had told me.

8 Q.    Tell me again.  What exactly did you tell

9       Dr. Lyndsey?

10 A.   That Lora expressed to Kristin that she was

11      hurting when she was filing the charts back

12      and that she felt like her water was going

13      to break and if it did to take her to

14      Baptist East.

15 Q.   Okay.  Did you go to Lora Seamon before you

16      went to Kathy Lyndsey to discuss the matter?

17 A.   No.

18 Q.   So you went directly to Kathy Lyndsey?

19 A.   Yes.

20 Q.   What was Kathy Lyndsey's response to your

21      expression of concern that you learned from

22      Kristin Thomas?

23 A.   She was concerned and asked me if I would go

## FOSHEE & TURNER COURT REPORTERS

46

1      get Lora so that we could discuss it.

2 Q.   Okay.  Did you do that?

3 A.   I did.

4 Q.   About what time of day was this?

5 A.   It was right after lunch, approximately two.

6 Q.   Okay.  So on this day, Lora had worked from

7      eight and then gone to lunch.  How long is

8      the lunch period?

9 A.   An hour.

10 Q.  Okay.  And then she had come back and worked

11     and then at approximately two o'clock you go

12     and get Lora Seamon.  Where do you go with

13     her?

14 A.  To Dr. Kathy Lyndsey's office.

15 Q.  When you first approached Lora Seamon, what

16     did you say to her?

17 A.  I said, Dr. Kathy would like to speak with

18     you.

19 Q.  Did you ask her any questions at that time

20     before you took her to see Dr. Lyndsey about

21     her pregnancy?

22 A.  No, sir.

23 Q.  Did you ask her about any concerns that Lora

# FOSHEE & TURNER COURT REPORTERS

47

1    Rae might have about her responsibilities as

2    a file clerk?

3 A.  No, sir.

4 Q.  Okay.  Did Lora Rae Seamon express any

5    concern as to why she was going to see

6    Dr. Lyndsey?

7 A.  No, sir.

8 Q.  She simply complied?

9 A.  Yes, sir.

10 Q.  Is it fair to say she followed you to

11    Dr. Lyndsey's office?

12 A.  Yes, sir.

13 Q.  And is that where you ultimately met, in

14    Dr. Lyndsey's office?

15 A.  Yes.

16 Q.  Okay.  Does Dr. Lyndsey maintain one office?

17 A.  Two.

18 Q.  Two.  Okay.  Which office of the two did you

19    meet in?

20 A.  Her personal physician office.

21 Q.  All right.  What's her other office called?

22 A.  It's the office manager office where we keep

23    our other work.

## FOSHEE & TURNER COURT REPORTERS

48

1 Q. So you met in her personal physician's

2    office?

3 A. Correct.

4 Q. And at the time it was you, Dr. Lyndsey, and

5    Lora Rae Seamon; correct?

6 A. Correct.

7 Q. Was there anyone else present in the room at

8    that time?

9 A. No, sir.

10 Q. Okay.  Who spoke first?

11 A. Dr. Kathy Lyndsey.

12 Q. What did she say, as specifically as you can

13    remember?

14 A. As best I recall, she said that a coworker

15    had said that she was having pain or -- I'm

16    not sure if she used the word pain or

17    hurting -- when she was filing charts back

18    and was that true.

19 Q. Did Lora Rae Seamon respond?

20 A. Yes.

21 Q. If you can recall, using the exact words,

22    what did she say?

23 A. I don't recall that.

## FOSHEE & TURNER COURT REPORTERS

49

1 Q.  Okay.  Did you make any comments during this

2      period of time?

3 A.  No, sir.

4 Q.  Then what happened?

5 A.  After that question?

6 Q.  And the response that was received that you

7      cannot recall.

8 A.  Dr. Kathy Lyndsey went over again what the

9      job duties were that she went over in the

10     pre-interview and Lora agreed that she did

11     talk to her about that and Lora said that

12     she had a five-pound weight restriction

13     given to her by her OB/GYN.

14 Q.  So Lora specifically stated that she had a

15     five-pound weight restriction?

16 A.  Correct.

17 Q.  And you know it was five pounds?

18 A.  That's what she said.

19 Q.  Did she produce any documentation to

20     demonstrate that she had a five-pound weight

21     restriction?

22 A.  No, sir.

23 Q.  So in the course of this conversation, I

**FOSHEE & TURNER COURT REPORTERS**

50

1    guess the last person that we hear you

2    saying speak was the plaintiff, Ms. Seamon,

3    when she said she had a five-pound weight

4    restriction.  Who spoke next?

5 A.  Dr. Kathy Lyndsey.

6 Q.  And what did she say?

7 A.  She said that, I guess you're not gonna --

8    are you gonna -- do you feel that you can do

9    the job?  And there was no response at that

10    time from Lora and so Dr. Kathy again says,

11    Well, I guess you don't -- you're not going

12    to be able to do the job, and she giggled,

13    shrugged her shoulders, and said okay.

14 Q.  She giggled.  Lora Rae Seamon giggled?

15 A.  She giggled.

16 Q.  Was it a nervous response, in your

17    estimation?

18 A.  I don't know.

19 Q.  Okay.  Then what happened?

20 A.  She left.

21 Q.  Lora Rae left?

22 A.  The office, uh-huh.

23 Q.  Okay.  At any time during this meeting did

51

```
 1      Dr. Lyndsey inquire as to whether or not
 2      Ms. Seamon had experienced any complications
 3      with her pregnancy?
 4 A.   No, sir.
 5 Q.   Did it come as a surprise to you to learn
 6      that Lora Rae Seamon was pregnant when
 7      Kristin Thomas came and told you that she
 8      heard that these -- these statements from
 9      Lora Rae Seamon?
10 A.   Yes.
11 Q.   You had no idea that Ms. Seamon was
12      pregnant?
13 A.   No, I didn't.
14 Q.   Did Dr. Lyndsey inquire as to whether or not
15      Ms. Seamon had a doctor that she was seeing
16      in regards to her pregnancy?
17 A.   That came from Lora.
18 Q.   When?
19 A.   When Lora stated that she had a five-pound
20      weight restriction from her physician.
21 Q.   Okay.  Did she tell you who her physician
22      was?
23 A.   No.
```

## FOSHEE & TURNER COURT REPORTERS

52

1 Q.   She just said, I've got a five-pound weight

2      restriction from my physician?

3 A.   Yes.

4 Q.   Is that pretty much the exact same words

5      that she used?

6 A.   That I can recall.

7 Q.   Okay.  Did you ask her why, when she had

8      done her interview just a few days earlier

9      on Friday, she had not indicated that she

10     had a weight restriction?

11 A.  I did not ask her that.

12 Q.  Did Dr. Lyndsey ask her that?

13 A.  She did.

14 Q.  What did she say specifically to Lora Rae

15     Seamon?

16 A.  Why didn't you not let us know about this,

17     your weight restriction.

18 Q.  Okay.  And what was Lora Rae's response?

19 A.  She did not feel it was a problem.

20          MR. NELMS:  Nothing further.

21          MR. WILSON:  I don't have anything.

22     (The deposition of Sharon Hayes concluded at

23     11:37 a.m. on October 12, 2005.)