# FOSHEE & TURNER COURT REPORTERS

1

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE MIDDLE DISTRICT OF ALABAMA

3     NORTHERN DIVISION

4

5     LORA RAE SEAMON,

6         Plaintiff,

COPY

7

8     vs.        CIVIL ACTION NO. 2:05-cv-00486-T

9

10    ALABAMA FAMILY PRACTICE,

11        Defendant.

12

13

14         *    *    *    *    *    *

15    **DEPOSITION OF LORA RAE SEAMON**, taken

16    pursuant to notice and stipulation on behalf

17    of the Defendant, at Rushton, Stakely,

18    Johnston, & Garrett, 184 Commerce Street,

19    Montgomery, Alabama, before Bridgette

20    Mitchell, Shorthand Reporter and Notary

21    Public in and for the State of Alabama at

22    Large, on October 12, 2005, commencing at

23    1:08 p.m.

EXHIBIT
3

# FOSHEE & TURNER COURT REPORTERS

10

1 Q.  From what?

2 A.  Montgomery Water Works.

3 Q.  And how long did he work for the water

4     works?

5 A.  I'm not sure.

6 Q.  Years and years?

7 A.  Yes, because he retired.

8 Q.  All right.  Are you currently married?

9 A.  No.

10 Q.  Have you ever been married?

11 A.  No.

12 Q.  What is your education?

13 A.  Graduated from high school.

14 Q.  From?

15 A.  Prattville High School.

16 Q.  Okay.  What year?

17 A.  2004.

18 Q.  Okay.  Any other education -- formal

19     education?

20 A.  No.

21 Q.  Are you currently employed?

22 A.  Yes.

23 Q.  Where?

## FOSHEE & TURNER COURT REPORTERS

11

1  A.  Baptist Medical Center.

2  Q.  As a what?

3  A.  I work in centralized scheduling, patient

4      registration.

5  Q.  Which Baptist?

6  A.  It's in the DeBoer Building behind Baptist

7      East.  It's an executive building.

8  Q.  And you're involved with scheduling?

9  A.  Well, it's patient registration.

10  Q.  Okay.  How long have you had that job?

11  A.  Since March 1.

12  Q.  Of '05?

13  A.  Yes.

14  Q.  Is that full-time?

15  A.  Yes.

16  Q.  Has it always been full-time?

17  A.  Yes.

18  Q.  What's your rate of pay there currently?

19  A.  It's 8.09.

20  Q.  Is that what you started out at in March?

21  A.  Yes.

22  Q.  Are you eligible for any benefits at

23      Baptist?

## FOSHEE & TURNER COURT REPORTERS

12

1 A.   Yes.

2 Q.   What?

3 A.   I have health insurance.

4 Q.   Through Blue Cross?

5 A.   Yes.  No, VIVA.  Sorry.

6 Q.   What else?

7 A.   I have dental through Blue Cross.  I have a

8       retirement plan through them.

9 Q.   Do you have sick time and vacation time?

10 A.   Yes.

11 Q.   How much?

12 A.   I'm not sure.  I have, like, it's called

13       PTO; and then I'm not sure what the sick

14       time is called, but we have that also.

15 Q.   Did you qualify for all of these benefits

16       immediately upon taking that job?

17 A.   Yes.

18 Q.   As far as the compensation frame work goes

19       at Baptist, are you eligible for a raise at

20       any point?

21 A.   Yes.

22 Q.   When?

23 A.   It will be March 1 of next year.

## FOSHEE & TURNER COURT REPORTERS

18

1     where did you work next?

2 A.   That was it.

3 Q.   So at any point in time have you been

4      employed by anyone other than Fountain City

5      Eyecare, Wal-Mart, Alabama Family Practice

6      and your father's lawn mower business?

7 A.   No.

8 Q.   How did you first become aware of a job

9      vacancy at Alabama Family Practice?

10 A.  My mother looked on the Internet and found

11     it, the job opening.  I think it was on

12     Monster Jobs or something.  It was on the

13     Internet, yes.

14 Q.  Did you look at the website posting

15     yourself?

16 A.  No.

17 Q.  Do you have any knowledge as we sit here

18     today what it said?

19 A.  No.

20 Q.  How did you make contact with the Alabama

21     Family Practice?

22 A.  I faxed my resume.

23 Q.  To whom?

## FOSHEE & TURNER COURT REPORTERS

19

1 A.   To the office.

2 Q.   Anybody in particular?

3 A.   No, sir.

4 Q.   All right.  And then how did it come to pass

5      that you got an interview there after you

6      faxed in your resume?

7 A.   Ms. Hines (sic) called me for an interview.

8 Q.   What did she say to you?

9 A.   I don't remember the exact conversation, but

10      I know she told me to come in for an

11      interview on the 3rd.

12 Q.   When did she call you?  How far in advance

13      of the 3rd?

14 A.   I'm not sure.

15 Q.   Did she call you at your parents' house?

16 A.   Yes.

17 Q.   When you had communication with Ms. Hayes,

18      did she give you any specifics as to what

19      the job vacancy entailed?

20 A.   No, not on the phone.  No.

21 Q.   Did she give you any information about any

22      aspect of the job vacancy other than that

23      there was one --

## FOSHEE & TURNER COURT REPORTERS

20

1 A.   No.

2 Q.   -- during that telephone call?

3 A.   No.

4 Q.   Did you understand you were applying for a

5      vacancy characterized as a file clerk?

6 A.   Yes.

7 Q.   Had you had any experience doing file --

8      dealing with files in a health care context?

9 A.   Yes.

10 Q.   From Fountain City Eyecare?

11 A.   Yes.

12 Q.   Anything other than that?

13 A.   No.

14 Q.   Did Ms. Hayes ask you any questions during

15      that telephone call about yourself, your

16      background, anything like that?

17 A.   Not that I recall.

18 Q.   Did you tell Ms. Hayes during that telephone

19      conversation that you were pregnant?

20 A.   No.

21 Q.   Did she ask?

22 A.   No.

23 Q.   Did she ask you during that telephone call

## FOSHEE & TURNER COURT REPORTERS

21

1       if there was any issue or -- that may affect

2       your candidacy for that position?

3 A.    No.

4 Q.    Was your -- did you have any contact with

5       anyone at Alabama Family Practice between

6       that telephone call with Sharon Hayes and

7       your eventual trip to the office for the

8       interview?

9 A.    No.

10 Q.   Did y'all discuss compensation during the

11      telephone call; or benefits?

12 A.   No.

13 Q.   Before we talk about the interview at

14      Alabama Family Practice, I want to ask you

15      some questions about your pregnancy.  When

16      did you first learn you were pregnant?

17 A.   April 2004.

18 Q.   2004?

19 A.   Uh-huh.

20 Q.   Yes?

21 A.   Uh-huh.  Yes.

22 Q.   All right.  Had -- so by December -- say

23      December 1, 2004, you were in what month of

## FOSHEE & TURNER COURT REPORTERS

22

1    your pregnancy?

2 A.   Eighth.  It was, like, eight and a half.

3 Q.   What was your -- did you deliver the

4      child --

5 A.   Yes.

6 Q.   -- subsequently?  What's the baby's

7      birthday?

8 A.   January 7, 2005.

9 Q.   Was that an on-time delivery?

10 A.  No.

11 Q.  Early or late?

12 A.  Early.

13 Q.  How early?

14 A.  About two weeks.

15 Q.  Boy or girl?

16 A.  Girl.

17 Q.  And we've already -- your doctor was Allen

18     Dupre?

19 A.  Yes.

20 Q.  Did you have any other physician that

21     treated you during your pregnancy?

22 A.  No.

23 Q.  Did you ever see any of Dr. Dupre's

## FOSHEE & TURNER COURT REPORTERS

25

1    indication that you went in to see Dr. Dupre

2    on May 25.  Any reason to doubt that --

3    accuracy of that?

4 A.  I'm not sure.  That paper --

5 Q.  Yes.

6 A.  -- is just from my test.  There's -- I don't

7    know.

8 Q.  Okay.

9         MR. NELMS:  If you can answer the

10    question, answer it.  If you can't, say you

11    can't answer the question.

12        THE WITNESS:  Okay.  Sorry.

13 Q.  You saw Dr. Dupre on a regular basis

14    throughout the spring, late spring and

15    summer, fall of 2004?

16 A.  Yes.

17 Q.  All right.  Did you have any complications

18    at all with your pregnancy prior to, say,

19    December 3, 2004?

20 A.  No.

21 Q.  Had you experienced any premature labor

22    prior to December 3, 2004?

23 A.  No.

## FOSHEE & TURNER COURT REPORTERS

26

1 Q.   Had Dr. Dupre taken any precautions to

2      prevent any kind of premature labor or

3      contractions that you're aware of?

4 A.   No.

5 Q.   Did he put you on any medications?

6 A.   No.

7 Q.   Before December 3, 2004, had Dr. Dupre

8      imposed any activity restrictions on your

9      daily living?

10 A.  No.

11 Q.  Did Dr. Dupre, by way of example, on

12     December 3, 2004, had Dr. Dupre at any point

13     imposed any lifting weight restriction upon

14     you?

15 A.  No.

16 Q.  Did you and Dr. Dupre have any discussion at

17     any time during your pregnancy, say before

18     December 3, 2004, regarding your level of

19     activity, what was appropriate for you as a

20     pregnant female?

21 A.  No.

22 Q.  Did Dr. Dupre ever give you any document

23     that discussed activity restrictions or

## FOSHEE & TURNER COURT REPORTERS

27

1       weight lifting restrictions or anything like

2       that?

3  A.   No.

4  Q.   Had you missed any work at your prior

5       employers due to your pregnancy?

6  A.   No.

7  Q.   Was this your first pregnancy?

8  A.   Yes.

9  Q.   After -- well, first of all, can we agree

10      that you're -- that you presented to Alabama

11      Family Practice on December 3 for an

12      interview?

13 A.   Yes.

14 Q.   You agree with that?  And that you reported

15      for work on December 6 --

16 A.   Yes.

17 Q.   -- in your new job as file clerk; right?

18 A.   Yes.

19 Q.   And that December 6 was your first and last

20      day of employment at Alabama Family

21      Practice?

22 A.   Yes.

23 Q.   All right.  Now, from December 6 until the

## FOSHEE & TURNER COURT REPORTERS

38

1      Eyecare.  You see that?

2 A.   Yes.

3 Q.   And in the work performed section you

4      indicated that you had pulled and filed

5      patient records.  Do you recall that?

6 A.   Yes.

7 Q.   Tell me about your experience doing that

8      with Fountain City Eyecare?

9 A.   Every time a patient came in to see

10     Dr. Eischens, I would get the file ready for

11     the doctor to look at whenever the patient

12     came in.  And then when he was through with

13     it, I just filed it back in the file

14     cabinet.

15 Q.  Was Dr. Eischens the only -- is he an

16     optometrist or an opthalmologist?

17 A.  Optometrist.

18 Q.  Was he the only optometrist practicing there

19     at that facility?

20 A.  Yes.

21 Q.  How many patients did he see in a day on

22     average?

23 A.  I'm not sure.

## FOSHEE & TURNER COURT REPORTERS

1 Q.  All right.  Was there anyone else that did a

2      similar job while you were employed with

3      Dr. Eischens?

4 A.  Yes.

5 Q.  How many people?

6 A.  Two.

7 Q.  Were they full-time --

8 A.  Yes.

9 Q.  -- as well?  What were their names?

10 A.  Debbie and Vikki.

11 Q.  Do you know their last names?

12 A.  Vikki Daniels and Debbie Ellis.

13 Q.  Okay.  Do you have any estimate or judgment

14      as to the weight of Dr. Eischen's patient

15      files on average?

16 A.  I'm not sure.

17 Q.  Do you have any judgment or idea as to how

18      many patients Dr. Eischen had total?

19 A.  I'm not sure.

20 Q.  And you were part-time with him; correct?

21 A.  Yes.

22 Q.  And two of the three references you provided

23      were Debbie Ellis and Vikki Daniels?

## FOSHEE & TURNER COURT REPORTERS

42

1                    MR. NELMS:  Object to form.

2 A.   I don't recall.

3 Q.   Did she discuss anything in the way of

4       volume of patient files you could be

5       expected to handle in a given day?

6 A.   No.

7 Q.   Did she discuss anything with you in the way

8       of the weight of the files that you would be

9       expected to pull and then return at some

10      point to the proper storage area?

11 A.  No.

12 Q.  Did she ask you if you could lift heavy

13      boxes and files?

14 A.  No.

15 Q.  Did she ask you if you foresaw needing any

16      time off?

17 A.  No.

18 Q.  Did she ask you if you were pregnant?

19 A.  No.

20 Q.  What did you wear to that interview?

21 A.  I had on some black slacks,

22      pregnancy/maternity pants, and a button-up

23      maternity shirt.

## FOSHEE & TURNER COURT REPORTERS

43

1 Q.   Did you have on a jacket?

2 A.   Yes.

3 Q.   What kind of jacket?

4 A.   It was a black vinyl, almost looking leather

5      jacket.

6 Q.   Did you leave your jacket on?

7 A.   Yes.

8 Q.   Did Ms. Hayes ask you any questions during

9      the interview in the conference room about

10     your ability to lift documents or items that

11     you would come into contact with in your job

12     as a file clerk?

13            MR. NELMS:  Object to form.

14 A.  No.

15 Q.  Was there any discussion about lifting

16     requirements whatsoever during the initial

17     interview in the conference room?

18 A.  No.

19 Q.  As of December 3, 2004, do you believe it

20     would be evident to someone meeting you for

21     the first time that you were pregnant?

22 A.  Can you rephrase that?

23            MR. NELMS:  Object to the form.

## FOSHEE & TURNER COURT REPORTERS

44

1 Q.  Yeah.  As of January -- as of December 3,

2      2004, do you believe it would have been

3      evident to somebody that you had met for the

4      first time that you were eight months

5      pregnant?

6                MR. NELMS:  Object to the form.

7 A.  Yes.

8 Q.  Why?

9 A.  Did you mean that could you tell that I

10     was --

11 Q.  Yes.

12 A.  Okay.  Yes.  My stomach was really big.  I

13     was eight months pregnant.  I was huge.  I

14     mean, little here (indicating) and my

15     stomach protruding.

16 Q.  Little where?

17 A.  Up top.

18 Q.  Upper torso?

19 A.  Yes.

20 Q.  Do you have any photographs of yourself at

21     approximately the eight-month time frame of

22     your pregnancy?

23 A.  Yes.

## FOSHEE & TURNER COURT REPORTERS

51

1 Q.  Now, Dr. Lyndsey came in after you had

2      spoken with Sharon.  That's your

3      recollection?

4 A.  Yes.

5 Q.  Tell me what you and Dr. Lyndsey discussed.

6 A.  She basically introduced herself and that

7      was about it.  That's all I remember.

8 Q.  Okay.  Did Sharon leave the room when

9      Dr. Lyndsey came in?

10 A.  No.

11 Q.  Were you left in the room alone for any

12      length of time?

13 A.  Yes.

14 Q.  How long?

15 A.  I'm not sure.

16 Q.  When?

17 A.  It was when Ms. Hines went to go get those

18      files for me to see if I could actually do

19      the job.

20 Q.  And that job was actually putting papers

21      into the file?

22 A.  Yes.

23 Q.  Did she test your ability to do anything

## FOSHEE & TURNER COURT REPORTERS

57

1 Q.  On the 3rd, other than your conversations

2      with Sharon and your introduction to

3      Dr. Lyndsey, did you have any opportunity to

4      talk with any other employee of that

5      practice that day?

6 A.  No.

7 Q.  Did you meet anybody else that day?

8 A.  She introduced me -- Ms. Hines introduced me

9      to everyone as I was walking around.

10 Q.  Did you meet Kristin that day?

11 A.  Not that I recall.

12 Q.  And then after you were shown around --

13      well, did Ms. Hayes show you the patient

14      file location?

15 A.  Yes.

16 Q.  Was there any discussion about the

17      availability of a cart to assist in moving

18      patient files?

19 A.  No.

20 Q.  Did she explain to you the way that files

21      were taken from the storage area and taken

22      to a different area of the practice?

23 A.  No, not on the 3rd.

## FOSHEE & TURNER COURT REPORTERS

58

1 Q. Okay.  And the last thing that happened on

2     the 3rd was you went back to the front

3     office -- the front conference room or --

4 A. Yes.

5 Q. -- the conference room?

6 A. Yes.

7 Q. And Ms. Hayes said that you could start on

8     Monday, the 6th?

9 A. Yes.

10 Q. All right.  Was there any other conversation

11     between you and anybody else at Alabama

12     Family Practice on December 3 that we

13     haven't talked about?

14 A. I remember asking Ms. Hines what I was

15     supposed to wear, what was my required

16     wardrobe.

17 Q. What did she say?

18 A. She told me that everyone wears scrubs.

19 Q. And was it your understanding, then, that

20     you could wear scrubs?

21 A. Yes.

22 Q. Was there any discussion about your being

23     pregnant during that discussion about

## FOSHEE & TURNER COURT REPORTERS

59

1    attire?

2 A.  No.

3 Q.  Didn't come up at all?

4 A.  No.

5 Q.  All right.  Anything else on the 3rd between

6    you and anybody at Alabama Family Practice?

7 A.  Not that I recall.

8 Q.  Did you meet the other two doctors on

9    Thursday -- I'm sorry -- on the 3rd,

10    December 3rd?

11 A.  No.

12 Q.  And you do not have a judgment as to

13    how long you were at the practice on

14    December 3rd?

15 A.  No.

16 Q.  Did you have any communications with anybody

17    at Alabama Family Practice from the time you

18    left on December 3rd until the time you

19    returned on December 6?

20 A.  No.

21 Q.  What time did you report for work on the

22    6th?

23 A.  I know I had to be there at eight.

## FOSHEE & TURNER COURT REPORTERS

60

1 Q.  Were you there at eight?

2 A.  Yes.

3 Q.  How did you get there?

4 A.  In my car.

5 Q.  Drive yourself?

6 A.  Yes.

7 Q.  All right.  What happened when you got there

8      on the 8th -- on the 6th?  I'm sorry.

9 A.  I had to wait up front for Ms. Hines to get

10     there, because she told me to meet her

11     there.  And -- you want to know everything

12     that happened that morning?

13 Q.  Well, let's start off and you start walking

14     me through it.

15 A.  Okay.

16 Q.  We'll probably stop and talk.

17 A.  Well, basically, I sat in her office most of

18     the morning filling out paperwork.

19 Q.  What was your attire that day?  What did you

20     wear?

21 A.  Scrubs.

22 Q.  What color?

23 A.  I'm not sure.

## FOSHEE & TURNER COURT REPORTERS

62

1 A.   After, you know, I filled out the papers in

2       her office, she took me around and showed me

3       what my job exactly entailed.  She --

4 Q.   Okay.  If I could stop you.

5 A.   All right.

6 Q.   I'm sorry.  Elaborate on that for me.

7       Specifically, what did she show you and

8       explain to you?

9 A.   There was charts already in a little --

10      there was like a little file cabinet thing

11      on the side of the wall up in the file room

12      and she pulled those down and put them on

13      the cart and we went around to the different

14      doctor stations and put those files what was

15      needed for that doctor on that desk, I guess

16      the nurses' station, and we took files that,

17      I guess, were already completed and we just

18      pushed the cart around to the different

19      nurses' stations.

20 Q.  At this point, were you and Ms. Hayes

21      dealing with what could be called stacks of

22      files?

23 A.  It was probably, maybe, about two or three

# FOSHEE & TURNER COURT REPORTERS

63

1     at each station.

2 Q.  Two or three files?

3 A.  Yes.

4 Q.  Were you allowed to do this -- to deal with

5     the files yourself at that point or was

6     Ms. Hayes doing it and just simply showing

7     you how the files were moved around?

8 A.  Yes.

9 Q.  And y'all used the cart you said?

10 A.  Yes.

11 Q.  When she was showing you around, were you

12     required for any reason to go to the second

13     floor of the building to retrieve any

14     charts?

15 A.  No.

16 Q.  Did you meet the other two doctors on the

17     6th?

18 A.  Yes.

19 Q.  Both of them?

20 A.  Yes.

21 Q.  What happened after Ms. Hayes showed you

22     around as far as the file -- how files were

23     moved from one area to the other?

## FOSHEE & TURNER COURT REPORTERS

64

1 A.   I went to the file room and I began pulling

2      charts from the file room. And I pulled one

3      at a time and I had to insert different

4      documents into the file and then put the

5      file back on a shelf.

6 Q.   Okay. Were you inserting correspondence and

7      reports that had come in?

8 A.   Yes.

9 Q.   Were you doing this by yourself?

10 A.  Yes.

11 Q.  Ms. Hayes had basically turned you loose, so

12     to speak?

13 A.  Yes.

14 Q.  Were you using the cart for that?

15 A.  No.

16 Q.  About what time did you start actually

17     inputting documents in the files on your

18     own?

19 A.  I'm not sure of what time it was.

20 Q.  Do you have any judgment as to how long you

21     spent in Ms. Hayes's office that morning?

22 A.  I'm not sure.

23 Q.  Do you have any judgment as to how long you

## FOSHEE & TURNER COURT REPORTERS

65

1    were walking around with Ms. Hayes?

2 A.  I'm not sure.

3 Q.  Was anyone else in the file area when you

4    were placing documents into patient files

5    that morning?

6 A.  No.

7 Q.  What was Kristin Thomas's job?

8 A.  File clerk.  She was part-time.

9 Q.  Was she there that morning?

10 A.  She came in later that day after I was in

11    Ms. Hines' office.

12 Q.  You mean after you were in there that

13    morning?

14 A.  Yes.

15 Q.  Okay.  Did you do any other task alone that

16    morning other than place documents in the

17    patient files?

18 A.  No.

19 Q.  How long do you think you -- how long do you

20    think you were doing that?

21 A.  I'm not sure.

22 Q.  Did you have any difficulty at all doing

23    that?

## FOSHEE & TURNER COURT REPORTERS

66

1 A.  No.

2 Q.  Did you take a lunch break that day?

3 A.  Yes.

4 Q.  Did you eat lunch alone?

5 A.  No.

6 Q.  Who did you eat with?

7 A.  Kristin.

8 Q.  So Kristin showed up before your lunch hour?

9 A.  Yes.

10 Q.  When was your lunch hour or was it -- when

11     was your lunch break?

12 A.  I'm not sure.  I believe it was twelve, but

13     I'm not sure.

14 Q.  How long did you have for lunch?

15 A.  An hour.

16 Q.  Where did you go?

17 A.  To Moe's at East Chase.

18 Q.  Okay.  Anyone go with you other than

19     Kristin?

20 A.  No.

21 Q.  What did you and Kristin talk about at

22     lunch?

23 A.  About her college.  We talked about that for

## FOSHEE & TURNER COURT REPORTERS

67

1       a while.

2 Q.   Where was she in school?

3 A.   I believe it was AUM.  I believe.  I'm not

4       sure.  And we conversated about how excited

5       I was about being pregnant.  And then we

6       basically left that alone and moved back to

7       her talking about college and the people

8       that I know that she goes to college with

9       now.

10 Q.  Did you and Kristin have any opportunity to

11      work together on anything in that office

12      before you went to lunch together?

13 A.  Yes.

14 Q.  What did you do together?

15 A.  She was helping me pull the charts.  She had

16      her own separate stack that she did and I

17      had a separate stack.  We divided it and she

18      was helping me.

19 Q.  At what point did she come in and start

20      working on a separate stack?

21 A.  I'm not sure.

22 Q.  How long did y'all work on this project

23      simultaneously?

## FOSHEE & TURNER COURT REPORTERS

68

1 A.   It was until we left for lunch.

2 Q.   Do you have a judgement as to how long you

3      were both doing it?

4 A.   No.  I'm not sure.

5 Q.   Did you experience any physical discomfort

6      at that time when you and Kristin were both

7      putting documents in charts --

8 A.   No.

9 Q.   -- before lunch?

10 A.   No.

11 Q.   No pain?

12 A.   No.

13 Q.   No cramps?

14 A.   No.

15 Q.   Nothing that appeared to you to be a

16      contraction?

17 A.   No.

18 Q.   Did you make any comments to Kristin while

19      y'all were in the file area about any

20      discomfort or pain?

21 A.   No.

22 Q.   Did you make any statement to Kristin Thomas

23      that morning before you went to lunch about

## FOSHEE & TURNER COURT REPORTERS

69

1      being concerned that your water might break?

2 A.   No.

3 Q.   How about at lunch, did you make any

4      statement to Kristin about any type of

5      physical discomfort or pain?

6 A.   No.

7 Q.   Did you make any statement to Kristin at

8      lunch about being concerned your water might

9      break?

10 A.  No.

11 Q.  Did you make any statement to Kristin -- I

12     don't mean to bounce on you, but back before

13     lunch, did you make any statement to her

14     about if your water broke or if you had any

15     other problem with your pregnancy to take

16     you to Baptist East?

17 A.  No.

18 Q.  Did you make any statement like that to her

19     at lunch?

20 A.  No.

21 Q.  Did you make any statement like that to her

22     at any time?

23 A.  No.

## FOSHEE & TURNER COURT REPORTERS

70

1 Q.   Did you ever complain to Kristin Thomas of

2       any discomfort?

3 A.   No.

4 Q.   Did you ever complain or make any statement

5       to Kristin Thomas regarding any difficulty

6       you were experiencing in doing any task at

7       Alabama Family Practice?

8 A.   No.

9 Q.   Did you have an opportunity to interact with

10      anyone else at the practice before lunch

11      other than Sharon Hayes and then Kristin

12      Thomas?

13 A.  No, not that I recall.

14 Q.  Did you make any statement to anybody that

15      morning before lunch about any -- any

16      discomfort or pain associated with your

17      pregnancy?

18 A.  No.

19 Q.  Or discomfort or pain not associated with

20      your pregnancy?

21 A.  No.

22 Q.  Did you make any statement to anybody at the

23      practice that morning before lunch about

## FOSHEE & TURNER COURT REPORTERS

71

1    being concerned that your water might break?

2 A.   No.

3 Q.   Or what to do in the event your water broke?

4 A.   No.

5 Q.   Did you have any interaction with Dr. Kathy

6      Lyndsey before lunch that day?

7 A.   No.

8 Q.   No one else went to lunch with you and

9      Kristin?

10 A.   No.

11 Q.   After lunch, you finished up at Moe's.   Did

12      you go anywhere else?

13 A.   No.

14 Q.   Go back to the practice?

15 A.   Yes.

16 Q.   Have any idea when you returned to work?

17 A.   No.   But we were late coming back.

18 Q.   Why?

19 A.   I don't know.   We were late, though, coming

20      back.

21 Q.   How late?

22 A.   Maybe ten minutes, maybe.   I'm not sure.

23 Q.   Who drove?

## FOSHEE & TURNER COURT REPORTERS

72

1 A.   Kristin.

2 Q.   What happened when you got back to the

3      practice?

4 A.   I went back to the file room and I was going

5      to start working again, and I was just

6      putting my drink down and my purse down and

7      Kristin was nowhere.  I was, like, huh.  And

8      then Ms. Hines asked me to come step into

9      her office.

10 Q.  How long had you been back in the office

11     before Ms. Hayes approached you?

12 A.  I'd say maybe five minutes.

13 Q.  What did she say to you -- Ms. Hayes?

14 A.  She told me that Dr. Lyndsey wanted to speak

15     to me in the office, so I followed her.

16 Q.  Okay.  When you got back to the office, did

17     you and Kristin walk in together?

18 A.  Yes.

19 Q.  Do you know where she went?

20 A.  No.

21 Q.  All right.  So you followed Ms. Hayes to

22     Dr. Lyndsey's office?

23 A.  Yes.

## FOSHEE & TURNER COURT REPORTERS

73

1 Q.  Tell me what you recall about what happened

2     after that.

3 A.  Okay.  I know when I first walked in I said,

4     Ma'am?  Because I wanted to see what she

5     wanted.  And she asked me was I pregnant and

6     I said, Yes, ma'am.  And then she asked me

7     how far along I was, and I told her eight

8     months.  And she told me that I would not be

9     able to do the job that they were wanting me

10     to do.

11 Q.  Did she give you any specifics as to why she

12     felt you wouldn't be able to do the job?

13 A.  She said because of my pregnancy -- of being

14     pregnant.

15 Q.  What was your response?

16 A.  I was, like -- I went, Huh?  I remember

17     doing that.  And I was, like, I told her,

18     Nothing, that I was fine, that I don't

19     understand.

20 Q.  And what did she say?

21 A.  She just said that she don't believe that

22     I'd be able to work there.

23 Q.  And what was your response to that?

## FOSHEE & TURNER COURT REPORTERS

74

1 A.  I mean, I was just -- I was amazed. I was,

2     like -- I don't know. I don't know.

3 Q.  Was Ms. Hayes present for this conversation?

4 A.  Yes.

5 Q.  Anyone else?

6 A.  No.

7 Q.  Did you make any statements to Dr. Lyndsey

8     or Sharon Hayes about your pregnancy?

9 A.  No.

10 Q.  Did they make any statement to you to the

11     effect they didn't know you were pregnant?

12 A.  No.

13 Q.  Did they make any statement to you to the

14     effect of why didn't you tell us you were

15     pregnant?

16 A.  No.

17 Q.  Did you make any statement to them about

18     being under any lifting restriction or

19     weight restriction --

20 A.  No.

21 Q.  -- from Dr. Dupre?

22 A.  No.

23 Q.  Did they ask you any question about whether

## FOSHEE & TURNER COURT REPORTERS

75

 1    you were under any activity restriction?

 2 A.  No.

 3 Q.  That didn't come up at all?

 4 A.  No.

 5 Q.  Did Dr. Lyndsey make any specific statement

 6    to you other than what you've told me --

 7    that's a bad question.

 8        Did Dr. Lyndsey tell you at any point

 9    that she was terminating you?

10 A.  She didn't actually say "terminating," no.

11 Q.  Tell me exactly, to the best of your

12    recollection, what she said.

13 A.  She told me I was not going to be able to

14    perform the duties that they wanted me to

15    do.

16 Q.  And did you object to that?

17 A.  I told her --

18 Q.  I'm sorry.  Did you disagree with that --

19 A.  Yes.

20 Q.  -- verbally to her?  What did you tell her?

21 A.  I told her I was fine, that I didn't see

22    anything wrong.

23 Q.  And what was her response to that?

## FOSHEE & TURNER COURT REPORTERS

77

1    that's all I remember, because I was crying.

2    I was very upset.

3 Q.  Did you feel like you were being terminated?

4 A.  Yes.

5 Q.  Did you ask them if they were terminating

6    you?

7 A.  No.

8 Q.  Was there any discussion about any other

9    alternative?

10 A.  No.

11 Q.  And if I understand -- am I correct that you

12    had not even started your afternoon --

13 A.  No.

14 Q.  -- work --

15 A.  No.

16 Q.  -- before this conversation took place?

17    That's right?

18 A.  Yes.

19 Q.  Were you asked to sign anything during that

20    conversation?

21 A.  No.

22 Q.  Were you --

23 A.  Not that I recall.

## FOSHEE & TURNER COURT REPORTERS

78

1 Q.  Okay.  Were you asked to sign anything

2      before you left the practice that day?

3 A.  Yes.

4 Q.  What were you asked to sign?

5 A.  I'm not sure what it was.

6 Q.  Okay.  Let me show you what I'll mark as

7      Exhibit 2.

8               (Defendant's Exhibit 2 was

9               marked for identification.)

10 Q.  Do you recognize Defendant's Exhibit 2?

11 A.  Yes.

12 Q.  Is that -- was that document presented to

13      you on December 6?

14 A.  Yes.

15 Q.  By whom?

16 A.  By Ms. Hines.

17 Q.  At what point?

18 A.  It was right before I left.

19 Q.  Did she explain to you why she was giving

20      you that document?

21 A.  No.

22 Q.  Did you have an opportunity to read it?

23 A.  No.

## FOSHEE & TURNER COURT REPORTERS

79

1 Q.  Did you read it?

2 A.  No.

3 Q.  Did you sign it?

4 A.  Yes.

5 Q.  Why did you sign it if you didn't read it?

6 A.  Because they told me that it was just me

7     signing leaving.

8 Q.  Is that your signature on the document?

9 A.  Yes.

10 Q.  It says Lora Seamon -- Effective 12/6/2004.

11    Lora did not disclose to us that she was

12    eight months pregnant and we feel the job

13    duties that she was hired for will put her

14    at risk.  This job requires heavy lifting

15    and climbing stairs and will put a strain on

16    her.  Signing below acknowledges the

17    nondisclosure.

18         Can we agree that you never told

19    anyone at Alabama Family Practice that you

20    were eight months pregnant?

21 A.  I told Kristin.

22 Q.  Did you tell Dr. Lyndsey?

23 A.  When we got back from lunch, yes.

## FOSHEE & TURNER COURT REPORTERS

80

1 Q.  Any point before that?

2 A.  No.

3 Q.  What about --

4         MR. NELMS:  Wait a minute.  You

5    asked her if she told anyone else and she

6    said she told Dr. Lyndsey.

7         MR. WILSON:  After lunch.

8         MR. NELMS:  To clarify, that's at

9    the meeting that you had with Dr. Lyndsey

10   where you were brought in and asked were you

11   pregnant and you admitted you were pregnant?

12        THE WITNESS:  Yes.

13        MR. NELMS:  So you didn't tell her

14   you were pregnant, you just admitted when

15   she asked?

16        THE WITNESS:  Uh-huh.

17        MR. NELMS:  Okay.  Sorry.

18        MR. WILSON:  No problem.

19 Q.  Same question with Sharon Hayes, did you

20   ever -- can we agree that you never told

21   Sharon Hayes you were pregnant until this

22   meeting after lunch on December 6?

23 A.  Yes.

## FOSHEE & TURNER COURT REPORTERS

81

1 Q.   Was there any further discussion about

2      Defendant's Exhibit 2?

3 A.   No.

4 Q.   Did you have any other conversations or

5      communications with anybody at Alabama

6      Family Practice after you left the office on

7      the 6th?

8 A.   No, not that I recall.   No.

9 Q.   Did anything else occur between this meeting

10     and you leaving the practice?

11 A.   No.

12 Q.   Did you take any documents with you when you

13     left on the 6th?

14 A.   No.

15 Q.   Did you take any documents with you when you

16     left on the 3rd?

17 A.   No.

18 Q.   Did Dr. Lyndsey tell you to let her know if

19     there was anything else she could do for

20     you?

21 A.   No.

22 Q.   Did she express regret that your employment

23     had not worked out?

**FOSHEE & TURNER COURT REPORTERS**

89

1     would be, are you claiming damages for those

2     things?

3 A.  Yes.

4 Q.  Question two would be, give me a feel for

5     the nature of what you have experienced or

6     claim to have experienced in the way of

7     embarrassment, humiliation, mental anguish,

8     emotional distress.

9 A.  Okay.  I was hoping that I was having a job

10    that I was going to be able to take care of

11    my baby that I was fixing to have.  And, I

12    mean, that's embarrassing to my family and

13    everything, because I thought I was going to

14    be able to take care of my baby on my own.

15    I was so excited and then all of a sudden it

16    all just went away, everything was gone, and

17    I was all on my own again without any

18    financial -- anything helping me financially

19    with my baby.

20 Q.  Now, at that time, in December 2004, you

21    were living with your parents?

22 A.  Yes.

23 Q.  And you delivered your baby.  And what was

## FOSHEE & TURNER COURT REPORTERS

90

1        her birthday?

2 A.    January 7.

3 Q.    All right.  And by March of 2005, roughly

4        two months later, you took your current job

5        at Baptist; right?

6 A.    Yes.

7 Q.    Which is full-time?

8 A.    Yes.

9 Q.    It's always been full-time?

10 A.   Yes.

11 Q.   And is actually a higher rate of pay than

12       you were making at Alabama Family Practice?

13 A.   Yes.

14 Q.   Any other way, tangible way, that you've

15       experienced embarrassment, harassment, or

16       mental anguish as a result of your

17       employment with Alabama Family Practice

18       other than what you've told me?

19 A.   No, not that I recall.  No.

20 Q.   Thank you.

21            MR. WILSON:   I'm done.

22            MR. NELMS:   I've got a few

23       questions.

## FOSHEE & TURNER COURT REPORTERS

94

1 A.  Yes.  I bought -- I only bought two tops and

2      two bottoms.

3 Q.  Do you know what you paid?

4 A.  I'm not sure, maybe around -- I'm not sure.

5 Q.  Okay.  Was it your intention when you began

6      your employment at Alabama Family Practice

7      to stay on as a long-term employee?

8 A.  Yes.

9 Q.  During the short period of time that you

10      worked at Alabama Family Practice, did you

11      see or hear -- did you see or have contact

12      with any patient files that you considered

13      to be heavy?

14 A.  No.

15 Q.  Approximately how many total hours did you

16      work on December 6, 2004?

17 A.  Four or five.

18 Q.  Okay.  Did you get -- did you get paid?

19 A.  Yes.

20 Q.  Okay.  How much did you get paid?

21 A.  I'm not sure exactly.

22 Q.  But you -- your rate of pay was $7 an hour?

23 A.  Yes.

## FOSHEE & TURNER COURT REPORTERS

95

1 Q.  Did you receive a paycheck?

2 A.  Yes.

3 Q.  When did you receive that paycheck?

4 A.  I'm not sure because I received it in the

5      mail.  I'm not sure.

6 Q.  Okay.  During this deposition, you were

7      given this exit disclosure statement that

8      you were asked to sign and it was designated

9      as Defendant's Exhibit 2.  Do you recall

10     that?

11 A.  Yes.

12 Q.  Was that document given to you for your

13     signature during the meeting that you had

14     with Ms. Hayes and Dr. Lyndsey after lunch?

15 A.  It was given to me after the discussion.

16 Q.  Okay.  After which discussion?

17 A.  With Ms. -- Dr. Lyndsey.

18 Q.  Okay.  To the best of your knowledge, who

19     prepared this statement?

20 A.  Ms. Hines.

21 Q.  Okay.  Defendant's Exhibit 2 is what I'm

22     referring to.  Ms. Hines?

23 A.  Uh-huh.

## FOSHEE & TURNER COURT REPORTERS

106

1 A.  Yes.

2 Q.  Now, with respect to your feelings of

3      distress over an inability to care for your

4      baby, did you -- did you apply for any other

5      jobs between your baby's delivery and the

6      time you -- and Baptist East on March 1?

7 A.  No.

8 Q.  And as far as being able to care for your

9      baby, you acknowledge that you're making

10     more money at Baptist East than you would

11     have been making at Alabama Family Practice?

12 A. Yes.

13 Q.  And you were immediately entitled to

14     benefits at Baptist East, were you not?

15 A. Yes.

16 Q.  Whereas we can agree that you would have had

17     to have worked at Alabama Family Practice

18     for a period of time before you qualified

19     for benefits there; right?

20 A. Yes.

21 Q.  All right.  You told me at the outset of the

22     deposition that you had moved out in spring

23     of this year?

## FOSHEE & TURNER COURT REPORTERS

107

1 A.  Yes.

2 Q.  But you've recently moved back in as of last

3     Sunday?

4 A.  Yes.

5 Q.  Specifically, why did you move back in with

6     your parents?  You told me that you tried to

7     take on too much.  I get that.  But

8     specifically.

9 A.  It was costing me too much in gas, because

10    my parents keep my baby while I'm at work.

11    They keep her during the day.  And it was

12    costing me too much to go to Prattville and

13    then Montgomery and go back, you know, to

14    Prattville again and go to Millbrook,

15    so . . .

16 Q.  So the cost of living --

17 A.  Yes.

18 Q.  -- was an issue?

19 A.  Yes.

20 Q.  And by moving back in with your parents, you

21    didn't have to pay rent?

22 A.  Yes.

23 Q.  Is that right?

## FOSHEE & TURNER COURT REPORTERS

108

1 A.    Yes.

2 Q.    Okay.  Do your parents -- well, during the

3       time that you lived alone or at an

4       apartment, I guess, other than child care,

5       do your parents provide you with any funds

6       at all, money?

7                MR. NELMS:  Object to form.

8 A.    No.

9 Q.    And when you brought your baby home from the

10      hospital, you and the baby went back to your

11      parents' house?

12 A.   Yes.

13 Q.   All right.  Where you had been living and

14      where you continued to live until sometime

15      this past spring?

16 A.   Yes.

17 Q.   I think that's all.  I thank you.

18               MR. NELMS:  That's all I have.

19

20

21      (The deposition of Lora Rae Seamon concluded

22      at 3:05 p.m. on October 12, 2005.)

23

EXIT DISCLOSURE
12-06-2004


LORA SEAMON—EFFECTIVE 12-06-2004 LORA DID NOT DISCLOSE TO US THAT SHE
WAS 8 MONTHS PREGNANT AND WE FILL THE JOB DUTIES THAT SHE WAS HIRED
FOR WILL PUT HER AT RISK.  THIS JOB REQUIRES HEAVY LIFTING AND CLIMBING
STAIRS AND WILL PUT A STRAIN ON HER .


SIGNING BELOW ACKNOWLEDGES THE NON DISCLOSURE

_____
LORA SEAMON


DEFENDANT'S
EXHIBIT

2