**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

LORA RAE SEAMON,          *

                         *

      **Plaintiff,**         *

                         *

**v.**                       *     **Case No. 2:05-cv-486-wkw**

                         *

**ALABAMA FAMILY PRACTICE,**  *

**P.C.,**                      *

                         *

      **Defendant.**       *

## AFFIDAVIT OF KATHY LINDSEY, D.O.

STATE OF ALABAMA          )

MONTGOMERY COUNTY     )

BEFORE ME, a Notary Public, in and for said state and county, personally appeared KATHY LINDSEY, D.O., who is known to me, and who being first duly sworn on oath, deposes and states as follows:

1. My name is Kathy Lindsey, D.O. I am over the age of 19 years, and I have personal knowledge of all matters testified to in this affidavit.

2. I am a physician licensed to practice medicine in the State of Alabama, and I am the managing shareholder in Alabama Family Practice, P.C ("AFP"). AFP is a professional corporation that provides health care services to patients in the field of family practice.

3. In December 2004 (and currently) there were three shareholders in Alabama Family Practice, P.C.: myself, Mark Lindsey, D.O., and Ryan McWhorter, M.D. Throughout 2004, each of us owned one-third of the shares of AFP, and that remains the case at the present time.

EXHIBIT

4

4.  Although each of the three physician shareholders has an employment contract with AFP (true and correct copies of which are attached hereto as Exhibit 1-3), each of the three physician shareholders is an equal owner and manager of AFP.  Each physician shareholder possesses a broad control over the daily operations of AFP.  Each physician shareholder routinely assigns tasks to, and supervises the performance of, all AFP employees.

5.  Although I typically address matters associated with the hiring and firing of employees, I take action only after discussion with one or both of the other shareholders (emergencies excluded).  Each physician shareholder can hire and fire AFP employees upon consultation with the other shareholders.

6.  Other than obligations concerning maintenance for patient charts and records and "on call" availability, which are equally applicable to all physician shareholders, AFP does not supervise or control the day-to-day practices of the physician shareholders, and none of the physician shareholders reports to anyone higher in the organization.  None of the physician shareholders supervises or controls the day-to-day practices of the other two physician shareholders.

7.  None of the physician shareholders can be terminated or ousted from AFP at will. Any change in the shareholder's status vis-à-vis AFP would only follow the shareholder's wish to separate or neglect of duty, moral turpitude, violation of law, or some significant alteration of that shareholder's ability to practice medicine (e.g., loss of license to practice medicine, etc.) and therefore his or her ability to practice.

8.  Each of the physician shareholders maintains personal professional liability coverage. Each physician shareholder is personally liable in the event of a claim of that nature.  Costs associated with physician shareholder practice overhead, mortgage payments, professional

liability coverage, licensure and credentialing fees, health insurance, and salary are deducted from any bonus compensation calculation applicable to the physician.    Each physician shareholder pays his or her personal nursing assistant (an AFP employee) out of his or her own salary.  Physician shareholder salaries are set by all three shareholders during an annual meeting that follows consultation with an external accounting professional.  Each physician shareholder shares in all profits, losses, and liabilities of AFP, and each participates in any decision on the distribution of profits and losses.

9.  Excluding the three physician shareholders, AFP employed less than 15 employees at all times during the calendar years 2003 and 2004 except for the first bi-weekly pay period of June 2003 (16), the second bi-weekly pay period of June 2003 (15), both bi-weekly pay periods in July of 2003 (16), and the first bi-weekly pay period of January 2004 (15).  AFP employed between 10 and 14 employees (again excluding the three physician shareholders) at all other times during the calendar years 2003 and 2004.

_____
KATHY LINDSEY, D.O.

SWORN TO AND SUBSCRIBED before me, a Notary Public, on this _27th_ day of March, 2006.

_____
Notary Public

My commission expires: _11/24/07_

STATE OF ALABAMA )
:
COUNTY OF MONTGOMERY )

## CONTRACT OF EMPLOYMENT
## WITH
## KATHY LINDSEY, D.O.

THIS AGREEMENT made as of the ___7th___ day of ___November___, 2001, by and between **Alabama Family Practice, P.C.,** an Alabama professional corporation, hereinafter called "Employer" or "Corporation," and **Kathy Lindsey**, hereinafter called "Employee."

1. <u>Purpose and Employment</u>. The purpose of this Agreement is to define the relationship which shall exist between the Corporation as an employer and Kathy Lindsey, M.D. as an employee of the Corporation. Employer hereby employs Employee, and Employee hereby accepts employment upon the terms and conditions hereinafter set forth.

2. <u>Duties</u>. Employee agrees to practice family medicine solely as an employee of the Corporation and, except as agreed upon in writing between Employee and Employer, Employee shall devote her entire professional time to the affairs of the Corporation. In addition, Employee agrees to devote all necessary time and effort to the performance of such other duties concerning the Corporation as are assigned to her from time to time by the Board of Directors of Employer. Employee agrees that she shall be responsible for "on-call" duties approximately one-fourth of all weekends during the term of this. Weekend call duties begin at 5:00 p.m. Friday and continue until 8:00 a.m. on Monday. "On-call" duties on week-nights shall be divided equally among all professional employees in accordance with a schedule to be established by Employer. Employee's on-call duty each year shall include call for approximately one-fourth of the holiday periods during the term of the Agreement. A holiday period includes the entire period during which the Employer's

office is closed for the holiday including any weekend falling immediately prior to or following the holiday. Wherever the term "one-fourth" is used herein, during any time that the Employee shall employ more or less than four physicians, such fraction shall be adjusted to the number one divided by the number of physician employees of the Employer, unless otherwise agreed.

3.    Term.  The term of employment of this Agreement shall be for the period beginning May 4, 2001, for a term of one (1) year which shall be referred to as the Contract Year.  This Agreement shall be automatically renewed for subsequent one (1) year terms unless Corporation or Employee provide to the other written notice of termination at least sixty (60) days prior to the proposed termination date or unless employment is terminated as otherwise provided herein.

4.    Regular Compensation.  For all the services to be rendered by Employee in her capacity hereunder, including services as an officer, member of the Board of Directors or any other duties assigned her by the Board of Directors of Employer, Employer agrees to pay Employee the sum of $132,621.84 per calendar year, being $5,100.84 for each two week pay period of Employee, as such sum shall be adjusted from time to time by the Board of Directors. Such compensation shall be payable bi-weekly in arrears.  In the event that employment commences or terminates on a day other than the first or last day of the pay period, compensation for such pay period shall be prorated for the number of days employed.

5.    Bonus Compensation.  In accordance with the bonus procedures and timing of bonuses paid to other physician employees of the Employer, Employee will be paid a bonus at the end of each calendar year, computed by deducting from actual gross receipts of the Employer during the calendar year due to services rendered by Employee, the following:

2

(a)    one-fourth (and wherever one-fourth is used herein, it shall be adjusted to the fraction which equals one divided by the total number of physician employees of the Employer, if other than four), of the total overhead of Employer (computed according to Employer's current accounting practices exclusive of rent paid to KL&M, L.L.C.) for the period of the calendar year during which Employee was employed;

(b)    one-fourth of the mortgage payment paid by KL&M, L.L.C. to Regions representing the mortgage on the property rented by the practice.

(c)    all expenses paid or accrued during the calendar year and personally allocated to Employee in accordance with Employer's practices, which shall include, but not be limited to:

(i)    Employee's malpractice insurance premium;

(ii)    Employee's expenses of licensing and maintaining all medical credentials;

(iii)    Employee's individual or family health insurance paid by Employer;

(iv)    The cost of any other employee benefits provided to Employee by Employer;

(v)    Employee's salary and all payroll costs related to Employee, including any payments made to Employee under paragraphs 17 and 18;

(vi)    Expenses reimbursed to Employee for Employee's CME or other professional meeting fees and expenses;

(vii)    Medical association dues

6.    <u>Record Keeping</u>. Employee agrees to strictly adhere to the office policies established by the Employer relating to the maintenance of patient charts and records, posting of records relating to accounts receivable, and compliance with procedures and guidelines established by any third party payor or government agency relating to the reimbursement of Employer for services rendered. The president of the Employer shall have the sole discretion with respect to the proper maintenance of records and charts by Employee.

7.    <u>Vacation</u>. Employee shall be entitled to three (3) weeks vacation during each contract year of the employment term but no two weeks of such vacation may be taken consecutively. Any exceptions shall require prior approval.

8.    <u>Meetings and Post-Graduate Courses</u>. Employee is encouraged and is expected, from time to time, to attend scientific meetings, professional conventions, and post-graduate courses in her field of specialty. Attendance at such meetings, conventions and courses shall be prearranged with the President of Employer thirty (30) days in advance. In addition to the three weeks vacation provided in paragraph 10 above, Employee shall be entitled to up to one week absence from employment for attendance at such meetings and CME courses. Employer shall pay for reasonable preapproved expenses of such attendance, but such expenses shall be allocated as personal expenses of Employee for purposes of bonus payments as herein provided. Employee is also required to meet the requirements for membership in the American Academy of Family Physicians and American Medical Association.

4

9.    <u>Sickness and Total Disability</u>.  Employee shall be entitled to full pay for ten (10) working days of sick leave in each contract year because of sickness or accident not resulting in Employee becoming totally disabled, as that term is hereinafter defined in this paragraph.    Unused sick leave may not be carried over from one year to another, nor used for additional vacation, nor will cash be paid for unused vacation time..

In the event Employee shall become totally disabled, as that term is  defined in this paragraph 9, as a result of sickness or accident, and is unable to attend to her  duties described in this Agreement, she shall be paid her full salary for a period of ninety (90) days following such disability, or, if less, the period of time prior to the time that payments under any disability policy purchased by the Corporation for such Employee shall be in effect.  At the end of such period, the Corporation, at its option, shall have the right to immediately terminate this Employment Agreement. However, if prior to termination under this paragraph, Employee's disability shall have ended and she shall have taken up and performed her  duties hereunder, Employee shall be entitled to resume her employment hereunder as though she had not been disabled.

For the purpose of this Agreement, Employee shall be "totally disabled" if she meets the definition for disability under any policy of insurance carried by the Corporation for Employee, or, if no disability coverage is in effect for Employee, she is (1) unable to perform the usual and ordinary duties of her profession under this Agreement for at least twenty-five (25) hours per week and (2) is under the regular and personal care of a physician.

10.    <u>Health Insurance Plans</u>.  In addition to the regular compensation provided in paragraph 4 of this Agreement, the Employee shall be entitled to participate in any plans or agreements maintained by the Employer relating to health insurance provided for physicians and

their families.  Employer shall pay the full cost of coverage of Employee and her family during the term of this Agreement to the extent the cost of such coverage does not exceed the highest amount paid for any other physician employee of Employer and her family.  All such payments made on behalf of Employee shall be allocated as personal expenses of Employee for purposes of bonus payments as herein provided.

11.    <u>Other Employee Benefit Plans</u>.  Employee shall be entitled to participate in any employee benefit plan maintained by Employer in such Plan under the terms and conditions stated in such Plan at such time as Employee meets the criteria for eligibility to participate.

12.    <u>Off-Duty Hours</u>.  During off-duty hours, Employee agrees to inform the President of Employer, or her designee, how she may be contacted in the event of emergency.

13.    <u>Payments Upon Death</u>.  In the event of Employee's death during the term of this Agreement, this Agreement shall terminate immediately, and Employee's personal representative shall be entitled to receive the salary due Employee as to any period or portion thereof for which Employee was employed and shall be entitled to receive any bonus at year-end computed for the portion of the year such Employee was employed.

14.    <u>Termination of Employment</u>.

(a)    Employee may terminate this Agreement at any time upon ninety (90) days' notice to Employer.

(b)    Either party may immediately terminate this Agreement upon material breach by the other party, after notice and ten (10) days opportunity to cure such breach.

(c)    Employer may terminate this Agreement at any time upon notice to Employee for cause, which shall include neglect of duty, moral turpitude, any violations of law occurring while

6

on duty, loss of license to practice medicine in Alabama, loss of hospital privileges at any hospital at which the Employer practices, the imposition of any restrictions by the Drug Enforcement Administration on Employee's certification for prescribing medications or any actions by Employee which are inimical to the best interests of Employer.

(d)    Upon termination under any provision of this Agreement, Employer shall be obligated to pay Employee her  salary only for periods as to which Employee was employed. No bonus shall be due at year-end to an Employee whose employment terminated during the year for any reason other than death or divorce.

15.    <u>Actions Upon Termination</u>.   Upon termination of this Agreement as otherwise provided herein, if Employee is not continuing as an Employee or owner of Employer, the parties agree as follows:

(a)    Employer will make reasonable efforts to collect accounts receivable due to Employee's services for a period of sixty (60) days after such termination of employment.  Within a reasonable period, generally fifteen (15) days, following the end of each month after termination during the collection period, Employer will submit to Employee an accounting of collections for Employee during the month and will pay to Employee sixty (60%) percent of such collections, retaining the remainder for administrative costs.

(b)    Employee agrees to maintain at her  expense "tail" professional liability insurance coverage following her  termination of employment, either by separate "tail" policy covering the Employer as to professional services performed by Employee during the term of this Agreement or by other coverage satisfactory to Employer, unless such coverage is determined by Employer to be unnecessary because of uninterrupted coverage of Employee with the same insurer.

7

If Employee fails to provide proof of such coverage, Employer may obtain such coverage. Employer may offset any cost of obtaining such coverage against Employee's final salary payment, bonus, if any, due Employee at the end of the calendar year or sums due Employee as a result of collections after termination. To the extent such sums are insufficient to cover the obligations of Employee pursuant to this paragraph, Employee agrees to repay such sums to Employer.

(d)    Employee agrees that she will not directly or indirectly for a two (2) year period after such termination solicit patients of Employer, except for patients for whom Employee is designated on Employer's records as primary care provider, or provide information to any party concerning the patients or the patient list of Employer.

16.    <u>Working Facilities</u>. Employee shall be furnished with an office, technical help, and such other facilities and services as required for the performance of her duties hereunder.

17.    <u>Other Benefits Provided by Employer</u>. The Corporation does hereby agree to pay on behalf of or reimburse Employee for the following expenses during the term of and resulting from her employment under this Agreement:

(a)    All expenses incurred in the payment of premiums for professional liability insurance insuring Employee at the same level of coverage provided for all other physician employees of Employer;

(b)    All expenses for membership dues to the Alabama and Montgomery County Medical Associations.

18.    <u>Automotive Transportation</u>. Employee agrees to provide her own automotive transportation at Employee's sole cost and expense for the rendering of medical services to the public and for the benefit and convenience of the Employer. Employee further agrees to maintain at her

8

expense at all times public liability insurance coverage underwritten by an insurance company acceptable to Employer on all automobiles used by her in the performance of this contract in an amount of not less than $300,000/$500,000 coverage.

19.    Record Keeping.  If Employee fails to properly document patient records according to standards set forth by insurance companies, medicaid, medicare , or other payors, or takes other actions that result in fines, interest, liability or legal or accounting costs being incurred in connection with such actions or failure to keep proper records, Eemployee hereby agrees to indemnify Employer for all such fines, interest, liability or costs so incurred.

20.    Personal Services Contract.  This contract between Employer and Employee is for the personal services of Employee and shall not be the subject of any hypothecation, alienation or garnishment.

21.    Case Records and Histories.  All case records, case histories, X-ray films or personal and regular files concerning patients or patients consulted, interviewed or treated and cared for by Employee, shall belong to and remain the property of Employer unless otherwise requested by a patient.

22.    Waiver of Breach or Violation Not Deemed Continuing.  The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach thereof.

23.    Governing Rules and Regulations.  It is hereby mutually understood and agreed that the Articles of Incorporation and Bylaws of Employer, as amended from time to time, shall be considered part of this Agreement and executed copies of same shall be attached hereto and made a part hereof.

24.    <u>Authority</u>.  The provisions of this Agreement required to be approved by the Board of Directors of Employer have been so approved and authorized.

25.    <u>Governing Law</u>.  This Agreement shall be interpreted, construed and governed according to the laws of the State of Alabama.

26.    <u>Modification</u>.  This Agreement may not be amended, modified, altered or changed in any respect whatsoever, except by a further agreement in writing executed by the parties hereto.

27.    <u>Integration</u>.  This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the employment of Employee by Employer and contains all of the representations, covenants, and agreements between the parties with respect to such employment.

28.    <u>Paragraph Headings</u>.  The paragraph headings contained in this Agreement are for convenience only and shall in no manner be construed as a part of this Agreement.

29.    <u>Counterparts</u>.  This Agreement is executed in two (2) counterparts, each of which shall be deemed an original and together shall constitute one and the same Agreement.  One counterpart is delivered to each party hereto.


**[EXECUTION BEGINS ON FOLLOWING PAGE]**


10

**IN WITNESS WHEREOF,** Employer has caused this Agreement to be executed by its duly appointed officers and its seal to be hereunto affixed, and Employee has hereunto set her hand and seal, all as of the ___7th___ day of _November_, 2001.

                                    **ALABAMA FAMILY PRACTICE, P.C.,** an Alabama professional corporation

(SEAL)

                                    By: _____
                                          Kathy Lindsey
                                  As Its  President

                                              **EMPLOYER**

ATTEST:

_____
As Its Secretary

                                  _____
                                  Kathy Lindsey, D.O.

                                              **EMPLOYEE**

**STATE OF ALABAMA**         )
**COUNTY OF MONTGOMERY**    )

    I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that Kathy Lindsey, whose name as President of Alabama Family Practice, P.C., an Alabama professional corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation on the day the same bears date.

    GIVEN under my hand and official seal of office this ___7th___ day of _November_, 2001.

                                    _____
                                    NOTARY PUBLIC
                                    My Commission Expires: ___01/31/2005___

(S E A L)

11

**STATE OF ALABAMA** )
**COUNTY OF MONTGOMERY** )

        I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that Kathy Lindsey, D.O., whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, she executed the same voluntarily on the day the same bears date.

        GIVEN under my hand and official seal of office this 7th day of November, 2001.

                        _Anita O Hayslip_
                        NOTARY PUBLIC
                        My Commission Expires: _01/31/2005_

(S E A L)

12

STATE OF ALABAMA                )
                                :
COUNTY OF MONTGOMERY            )

## CONTRACT OF EMPLOYMENT
## WITH
## MARK LINDSEY, D.O.

THIS AGREEMENT made as of the _7th_ day of _November_ , 2001, by and between

**Alabama Family Practice, P.C.,** an Alabama professional corporation, hereinafter called

"Employer" or "Corporation," and **Mark Lindsey**, hereinafter called "Employee."

1.      <u>Purpose and Employment</u>.  The purpose of this Agreement is to define the

relationship which shall exist between the Corporation as an employer and Mark Lindsey, M.D. as

an employee of the Corporation.  Employer hereby employs Employee, and Employee hereby

accepts employment upon the terms and conditions hereinafter set forth.

2.      <u>Duties</u>.  Employee agrees to practice family medicine solely as an employee of the

Corporation and, except as agreed upon in writing between Employee and Employer, Employee shall

devote his entire professional time to the affairs of the Corporation.  In addition, Employee agrees

to devote all necessary time and effort to the performance of such other duties concerning the

Corporation as are assigned to him from time to time by the Board of Directors of Employer.

Employee agrees that he shall be responsible for "on-call" duties approximately one-fourth of all

weekends during the term of this.  Weekend call duties begin at 5:00 p.m. Friday and continue until

8:00 a.m. on Monday.  "On-call" duties on week-nights shall be divided equally among all

professional employees in accordance with a schedule to be established by Employer.  Employee's

on-call duty each year shall include call for approximately one-fourth of the holiday periods during

the term of the Agreement.  A holiday period includes the entire period during which the Employer's

office is closed for the holiday including any weekend falling immediately prior to or following the holiday. Wherever the term "one-faith" is used herein, during any time that the Employee shall employ more or less than four physicians, such fraction shall be adjusted to the number one divided by the number of physician employees of the Employer, unless otherwise agreed.

3.     <u>Term</u>. The term of employment of this Agreement shall be for the period beginning May 4, 2001, for a term of one (1) year which shall be referred to as the Contract Year. This Agreement shall be automatically renewed for subsequent one (1) year terms unless Corporation or Employee provide to the other written notice of termination at least sixty (60) days prior to the proposed termination date or unless employment is terminated as otherwise provided herein.

4.     <u>Regular Compensation</u>. For all the services to be rendered by Employee in his capacity hereunder, including services as an officer, member of the Board of Directors or any other duties assigned him by the Board of Directors of Employer, Employer agrees to pay Employee the sum of $132,621.84 per calendar year, being $5,100.84 for each two week pay period of Employee, as such sum shall be adjusted from time to time by the Board of Directors. Such compensation shall be payable bi-weekly in arrears. In the event that employment commences or terminates on a day other than the first or last day of the pay period, compensation for such pay period shall be prorated for the number of days employed.

5.     <u>Bonus Compensation</u>. In accordance with the bonus procedures and timing of bonuses paid to other physician employees of the Employer, Employee will be paid a bonus at the end of each calendar year, computed by deducting from actual gross receipts of the Employer during the calendar year due to services rendered by Employee, the following:

2

(a)     one-fourth (and wherever one-fourth is used herein, it shall be adjusted to the fraction which equals one divided by the total number of physician employees of the Employer, if other than four), of the total overhead of Employer (computed according to Employer's current accounting practices exclusive of rent paid to KL&M, L.L.C.) for the period of the calendar year during which Employee was employed;

(b)     one-fourth of the mortgage payment paid by KL&M, L.L.C. to Regions representing the mortgage on the property rented by the practice.

(c)     all expenses paid or accrued during the calendar year and personally allocated to Employee in accordance with Employer's practices, which shall include, but not be limited to:

(i)     Employee's malpractice insurance premium;

(ii)    Employee's expenses of licensing and maintaining all medical credentials;

(iii)   Employee's individual or family health insurance paid by Employer;

(iv)    The cost of any other employee benefits provided to Employee by Employer;

(v)     Employee's salary and all payroll costs related to Employee, including any payments made to Employee under paragraphs 17 and 18;

3

(vi)    Expenses reimbursed to Employee for Employee's CME or other professional meeting fees and expenses;

(vii)    Medical association dues

6.    <u>Record Keeping</u>. Employee agrees to strictly adhere to the office policies established by the Employer relating to the maintenance of patient charts and records, posting of records relating to accounts receivable, and compliance with procedures and guidelines established by any third party payor or government agency relating to the reimbursement of Employer for services rendered. The president of the Employer shall have the sole discretion with respect to the proper maintenance of records and charts by Employee.

7.    <u>Vacation</u>. Employee shall be entitled to three (3) weeks vacation during each contract year of the employment term but no two weeks of such vacation may be taken consecutively. Any exceptions shall require prior approval.

8.    <u>Meetings and Post-Graduate Courses</u>. Employee is encouraged and is expected, from time to time, to attend scientific meetings, professional conventions, and post-graduate courses in his field of specialty. Attendance at such meetings, conventions and courses shall be prearranged with the President of Employer thirty (30) days in advance. In addition to the three weeks vacation provided in paragraph 10 above, Employee shall be entitled to up to one week absence from employment for attendance at such meetings and CME courses. Employer shall pay for reasonable preapproved expenses of such attendance, but such expenses shall be allocated as personal expenses of Employee for purposes of bonus payments as herein provided. Employee is also required to meet the requirements for membership in the American Academy of Family Physicians and American Medical Association.

4

9.    <u>Sickness and Total Disability</u>.  Employee shall be entitled to full pay for ten (10) working days of sick leave in each contract year because of sickness or accident not resulting in Employee becoming totally disabled, as that term is hereinafter defined in this paragraph.    Unused sick leave may not be carried over from one year to another, nor used for additional vacation, nor will cash be paid for unused vacation time..

In the event Employee shall become totally disabled, as that term is  defined in this paragraph 9, as a result of sickness or accident, and is unable to attend to his duties described in this Agreement, he shall be paid his full salary for a period of ninety (90) days following such disability, or, if less, the period of time prior to the time that payments under any disability policy purchased by the Corporation for such Employee shall be in effect.  At the end of such period, the Corporation, at its option, shall have the right to immediately terminate this Employment Agreement. However, if prior to termination under this paragraph, Employee's disability shall have ended and he shall have taken up and performed his duties hereunder, Employee shall be entitled to resume his employment hereunder as though he had not been disabled.

For the purpose of this Agreement, Employee shall be "totally disabled" if he meets the definition for disability under any policy of insurance carried by the Corporation for Employee, or, if no disability coverage is in effect for Employee, he is (1) unable to perform the usual and ordinary duties of his profession under this Agreement for at least twenty-five (25) hours per week and (2) is under the regular and personal care of a physician.

10.    <u>Health Insurance Plans</u>.  In addition to the regular compensation provided in paragraph 4 of this Agreement, the Employee shall be entitled to participate in any plans or agreements maintained by the Employer relating to health insurance provided for physicians and

5

their families.   Employer shall pay the full cost of coverage of Employee and his family during the term of this Agreement to the extent the cost of such coverage does not exceed the highest amount paid for any other physician employee of Employer and his family.   All such payments made on behalf of Employee shall be allocated as personal expenses of Employee for purposes of bonus payments as herein provided.

11.   Other Employee Benefit Plans.   Employee shall be entitled to participate in any employee benefit plan maintained by Employer in such Plan under the terms and conditions stated in such Plan at such time as Employee meets the criteria for eligibility to participate.

12.   Off-Duty Hours.   During off-duty hours, Employee agrees to inform the President of Employer, or his designee, how he may be contacted in the event of emergency.

13.   Payments Upon Death.   In the event of Employee's death during the term of this Agreement, this Agreement shall terminate immediately, and Employee's personal representative shall be entitled to receive the salary due Employee as to any period or portion thereof for which Employee was employed and shall be entitled to receive any bonus at year-end computed for the portion of the year such Employee was employed.

14.   Termination of Employment.

(a)   Employee may terminate this Agreement at any time upon ninety (90) days' notice to Employer.

(b)   Either party may immediately terminate this Agreement upon material breach by the other party, after notice and ten (10) days opportunity to cure such breach.

(c)   Employer may terminate this Agreement at any time upon notice to Employee for cause, which shall include neglect of duty, moral turpitude, any violations of law occurring while

on duty, loss of license to practice medicine in Alabama, loss of hospital privileges at any hospital at which the Employer practices, the imposition of any restrictions by the Drug Enforcement Administration on Employee's certification for prescribing medications or any actions by Employee which are inimical to the best interests of Employer.

(d)    This Agreement shall automatically be terminated upon the date of filing of any action for divorce by either Dr. Kathy Lindsey or Dr. Mark Lindsey against the other, unless the Drs. Lindsey shall otherwise agree.

(e)    Upon termination under any provision of this Agreement, Employer shall be obligated to pay Employee his salary only for periods as to which Employee was employed. No bonus shall be due at year-end to an Employee whose employment terminated during the year for any reason other than death or divorce.

15.    Actions Upon Termination.    Upon termination of this Agreement as otherwise provided herein, if Employee is not continuing as an Employee or owner of Employer, the parties agree as follows:

(a)    Employer will make reasonable efforts to collect accounts receivable due to Employee's services for a period of sixty (60) days after such termination of employment. Within a reasonable period, generally fifteen (15) days, following the end of each month after termination during the collection period, Employer will submit to Employee an accounting of collections for Employee during the month and will pay to Employee sixty (60%) percent of such collections, retaining the remainder for administrative costs.

(b)    Employee agrees to maintain at his expense "tail" professional liability insurance coverage following his termination of employment, either by separate "tail" policy

7

covering the Employer as to professional services performed by Employee during the term of this Agreement or by other coverage satisfactory to Employer, unless such coverage is determined by Employer to be unnecessary because of uninterrupted coverage of Employee with the same insurer. If Employee fails to provide proof of such coverage, Employer may obtain such coverage. Employer may offset any cost of obtaining such coverage against Employee's final salary payment, bonus, if any, due Employee at the end of the calendar year or sums due Employee as a result of collections after termination. To the extent such sums are insufficient to cover the obligations of Employee pursuant to this paragraph, Employee agrees to repay such sums to Employer.

(d)    Employee agrees that he will not directly or indirectly for a two (2) year period after such termination solicit patients of Employer, except for patients for whom Employee is designated on Employer's records as primary care provider, or provide information to any party concerning the patients or the patient list of Employer.

16.    <u>Working Facilities</u>. Employee shall be furnished with an office, technical help, and such other facilities and services as required for the performance of his duties hereunder.

17.    <u>Other Benefits Provided by Employer</u>. The Corporation does hereby agree to pay on behalf of or reimburse Employee for the following expenses during the term of and resulting from his employment under this Agreement:

(a)    All expenses incurred in the payment of premiums for professional liability insurance insuring Employee at the same level of coverage provided for all other physician employees of Employer;

(b)    All expenses for membership dues to the Alabama and Montgomery County Medical Associations.

8

18.    <u>Automotive Transportation</u>.  Employee agrees to provide his own automotive transportation at Employee's sole cost and expense for the rendering of medical services to the public and for the benefit and convenience of the Employer.  Employee further agrees to maintain at his expense at all times public liability insurance coverage underwritten by an insurance company acceptable to Employer on all automobiles used by him in the performance of this contract in an amount of not less than $300,000/$500,000 coverage.

19.    <u>Record Keeping</u>.  If Employee fails to properly document patient records according to standards set forth by insurance companies, medicaid, medicare , or other payors, or takes other actions that result in fines, interest, liability or legal or accounting costs being incurred in connection with such actions or failure to keep proper records, Employee hereby agrees to indemnify Employer for all such fines, interest, liability or costs so incurred.

20.    <u>Personal Services Contract</u>.  This contract between Employer and Employee is for the personal services of Employee and shall not be the subject of any hypothecation, alienation or garnishment.

21.    <u>Case Records and Histories</u>.  All case records, case histories, X-ray films or personal and regular files concerning patients or patients consulted, interviewed or treated and cared for by Employee, shall belong to and remain the property of Employer unless otherwise requested by a patient.

22.    <u>Waiver of Breach or Violation Not Deemed Continuing</u>.  The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach thereof.

23.    Governing Rules and Regulations.  It is hereby mutually understood and agreed that the Articles of Incorporation and Bylaws of Employer, as amended from time to time, shall be considered part of this Agreement and executed copies of same shall be attached hereto and made a part hereof.

24.    Authority.  The provisions of this Agreement required to be approved by the Board of Directors of Employer have been so approved and authorized.

25.    Governing Law.  This Agreement shall be interpreted, construed and governed according to the laws of the State of Alabama.

26.    Modification.  This Agreement may not be amended, modified, altered or changed in any respect whatsoever, except by a further agreement in writing executed by the parties hereto.

27.    Integration.  This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the employment of Employee by Employer and contains all of the representations, covenants, and agreements between the parties with respect to such employment.

28.    Paragraph Headings.  The paragraph headings contained in this Agreement are for convenience only and shall in no manner be construed as a part of this Agreement.

29.    Counterparts.  This Agreement is executed in two (2) counterparts, each of which shall be deemed an original and together shall constitute one and the same Agreement.  One counterpart is delivered to each party hereto.


**[EXECUTION BEGINS ON FOLLOWING PAGE]**

10

**IN WITNESS WHEREOF**, Employer has caused this Agreement to be executed by its duly appointed officers and its seal to be hereunto affixed, and Employee has hereunto set his hand and seal, all as of the 7th day of *November*, 2001.

ALABAMA FAMILY PRACTICE, P.C., an Alabama professional corporation

(SEAL)

By: _____
    Kathy Lindsey
As Its  President

ATTEST:

    EMPLOYER

_____
As Its Secretary

_____
Mark Lindsey, D.O.

    EMPLOYEE

**STATE OF ALABAMA**      )
**COUNTY OF MONTGOMERY**    )

I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that Kathy Lindsey, whose name as President of Alabama Family Practice, P.C., an Alabama professional corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, she, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation on the day the same bears date.

GIVEN under my hand and official seal of office this 7th day of *November*, 2001.

_____
NOTARY PUBLIC
My Commission Expires: 01/31/2005

(S E A L)

11

**STATE OF ALABAMA** )
**COUNTY OF MONTGOMERY** )

        I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that Mark Lindsey, D.O., whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, he executed the same voluntarily on the day the same bears date.

        GIVEN under my hand and official seal of office this _7th_ day of _November_, 2001.

                                Anita D. Hayslip
                                  NOTARY PUBLIC
                                  My Commission Expires: 01/31/2005

(S E A L)

12

STATE OF ALABAMA          )
                                     :

COUNTY OF MONTGOMERY     )

## CONTRACT OF EMPLOYMENT
## WITH
## W. RYAN MCWHORTER, M.D.

THIS AGREEMENT made as of the ___7ᵗʰ___ day of ___November___, 2001, by and between

**Alabama Family Practice, P.C.,** an Alabama professional corporation, hereinafter called

"Employer" or "Corporation," and **W. Ryan McWhorter**, hereinafter called "Employee."

      1.      <u>Purpose and Employment</u>.  The purpose of this Agreement is to define the

relationship which shall exist between the Corporation as an employer and W. Ryan McWhorter,

M.D., as an employee of the Corporation. Employer hereby employs Employee, and Employee

hereby accepts employment upon the terms and conditions hereinafter set forth.

      2.      <u>Duties</u>.  Employee agrees to practice family medicine solely as an employee of the

Corporation and, except as agreed upon in writing between Employee and Employer, Employee shall

devote his entire professional time to the affairs of the Corporation. In addition, Employee agrees

to devote all necessary time and effort to the performance of such other duties concerning the

Corporation as are assigned to him from time to time by the Board of Directors of Employer.

Employee agrees that he shall be responsible for "on-call" duties approximately one-fourth of all

weekends during the term of this. Weekend call duties begin at 5:00 p.m. Friday and continue until

8:00 a.m. on Monday. "On-call" duties on week-nights shall be divided equally among all

professional employees in accordance with a schedule to be established by Employer. Employee's

on-call duty each year shall include call for approximately one-fourth of the holiday periods during

the term of the Agreement. A holiday period includes the entire period during which the Employer's

office is closed for the holiday including any weekend falling immediately prior to or following the holiday. Wherever the term "one-fourth" is used herein, during any time that the Employer shall employ more or less than four physicians, such fraction shall be adjusted to the number one divided by the number of physician employees of the Employer, unless otherwise agreed.

      3.     <u>Term</u>. The term of employment of this Agreement shall be for the period beginning May 4, 2001, for a term of one year which shall be referred to as the Contract Year. This Agreement shall be automatically renewed for subsequent one (1) year terms unless Corporation or Employee provide to the other written notice of termination at least sixty (60) days prior to the proposed termination date or unless employment is terminated as otherwise provided herein.

      4.     <u>Regular Compensation</u>. For all the services to be rendered by Employee in his capacity hereunder, including services as an officer, member of the Board of Directors or any other duties assigned him by the Board of Directors of Employer, Employer agrees to pay Employee the sum of $94,756.22 per calendar year, being $3,644.47 for each two week pay period of Employee, and such sum shall be adjusted from time to time by the Board of Directors. Such compensation shall be payable bi-weekly in arrears. In the event that employment commences or terminates on a day other than the first or last day of the pay period, compensation for such pay period shall be prorated for the number of days employed.

      5.     <u>Bonus Compensation</u>. In accordance with the bonus procedures and timing of bonuses paid to other physician employees of the Employer, Employee will be paid a bonus at the end of each calendar year, computed by deducting from actual gross receipts of the Employer during the calendar year due to services rendered by Employee, the following:

(a)    one-fourth (and wherever one-fourth is used herein, it shall be adjusted to the fraction which equals one divided by the total number of physician employees of the Employer, if other than four), of the total overhead of Employer (computed according to Employer's current accounting practices exclusive of rent paid to KL&M, L.L.C.) for the period of the calendar year during which Employee was employed;

(b)    one-fourth of the mortgage payment paid by KL&M, L.L.C. to Regions representing the mortgage on the property rented by the practice.

(c)    all expenses paid or accrued during the calendar year and personally allocated to Employee in accordance with Employer's practices, which shall include, but not be limited to:

(i)    Employee's malpractice insurance premium;

(ii)    Employee's expenses of licensing and maintaining all medical credentials;

(iii)    Employee's individual or family health insurance paid by Employer;

(iv)    The cost of any other employee benefits provided to Employee by Employer;

(v)    Employee's salary and all payroll costs related to Employee, including any payments made to Employee under paragraphs 17 and 18;

3

(vi)    Expenses reimbursed to Employee for Employee's CME or other professional meeting fees and expenses;

(vii)    Medical association dues

(viii)    For the first twenty-four (24) months of the Employment Term, the sum of $970.91 monthly.

6.    <u>Record Keeping</u>.  Employee agrees to strictly adhere to the office policies established by the Employer relating to the maintenance of patient charts and records, posting of records relating to accounts receivable, and compliance with procedures and guidelines established by any third party payor or government agency relating to the reimbursement of Employer for services rendered.  The president of the Employer shall have the sole discretion with respect to the proper maintenance of records and charts by Employee.

7.    <u>Vacation</u>.  Employee shall be entitled to three (3) weeks vacation during each contract year of the employment term but no two weeks of such vacation may be taken consecutively.  Any exceptions shall require prior approval.

8.    <u>Meetings and Post-Graduate Courses</u>.  Employee is encouraged and is expected, from time to time, to attend scientific meetings, professional conventions, and post-graduate courses in his field of specialty.  Attendance at such meetings, conventions and courses shall be prearranged with the President of Employer thirty (30) days in advance.  In addition to the three weeks vacation provided in paragraph 10 above, Employee shall be entitled to up to one week absence from employment for attendance at such meetings and CME courses.  Employer shall pay for reasonable preapproved expenses of such attendance, but such expenses shall be allocated as personal expenses of Employee for purposes of bonus payments as herein provided.  Employee is also required to meet

4

the requirements for membership in the American Academy of Family Physicians and American Medical Association.

9.    <u>Sickness and Total Disability</u>. Employee shall be entitled to full pay for ten (10) working days of sick leave in each contract year because of sickness or accident not resulting in Employee becoming totally disabled, as that term is hereinafter defined in this paragraph.    Unused sick leave may not be carried over from one year to another, nor used for additional vacation, nor will cash be paid for unused vacation time..

In the event Employee shall become totally disabled, as that term is defined in this paragraph 9, as a result of sickness or accident, and is unable to attend to his duties described in this Agreement, he shall be paid his full salary for a period of ninety (90) days following such disability, or, if less, the period of time prior to the time that payment under any disability policy purchased by the Corporation for such Employee shall be in effect.  At the end of such period, the Corporation, at its option, shall have the right to immediately terminate this Employment Agreement. However, if prior to termination under this paragraph, Employee's disability shall have ended and he shall have taken up and performed his duties hereunder, Employee shall be entitled to resume his employment hereunder as though he had not been disabled.

For the purpose of this Agreement, Employee shall be "totally disabled" if he meets the definition for disability under any policy of insurance carried by the Corporation for Employee, or, if no disability coverage is in effect for Employee, he is (1) unable to perform the usual and ordinary duties of his profession under this Agreement for at least twenty-five (25) hours per week and (2) is under the regular and personal care of a physician.

5

10.   <u>Health Insurance Plans</u>.   In addition to the regular compensation provided in paragraph 4 of this Agreement, the Employee shall be entitled to participate in any plans or agreements maintained by the Employer relating to health insurance provided for physicians and their families.   Employer shall pay the full cost of coverage of Employee and his family during the term of this Agreement to the extent the cost of such coverage does not exceed the highest amount paid for any other physician employee of Employer and his family.   All such payments made on behalf of Employee shall be allocated as personal expenses of Employee for purposes of bonus payments as herein provided.

11.   <u>Other Employee Benefit Plans</u>.   Employee shall be entitled to participate in any employee benefit plan maintained by Employer in such Plan under the terms and conditions stated in such Plan at such time as Employee meets the criteria for eligibility to participate.

12.   <u>Off-Duty Hours</u>.   During off-duty hours, Employee agrees to inform the President of Employer, or his designee, how he may be contacted in the event of emergency.

13.   <u>Payments Upon Death</u>.   In the event of Employee's death during the term of this Agreement, this Agreement shall terminate immediately, and Employee's personal representative shall be entitled to receive the salary due Employee as to any period or portion thereof for which Employee was employed and shall be entitled to receive any bonus at year-end computed for the portion of the year such Employee was employed.

14.   <u>Termination of Employment</u>.

(a)   Employee may terminate this Agreement at any time upon ninety (90) days' notice to Employer.

6

(b)    Either party may immediately terminate this Agreement upon material breach by the other party, after notice and ten (10) days opportunity to cure such breach.

(c)    Employer may terminate this Agreement at any time upon notice to Employee for cause, which shall include neglect of duty, moral turpitude, any violations of law occurring while on duty, loss of license to practice medicine in Alabama or loss of hospital privileges at any hospital at which the Employer practices, the imposition of any restrictions by the Drug Enforcement Administration on Employee's certification for prescribing medications or any actions by Employee which are inimical to the best interests of Employer.

(d)    Upon termination under any provision of this Agreement, Employer shall be obligated to pay Employee his salary only for periods as to which Employee was employed. No bonus shall be due at year-end to an Employee whose employment terminated during the year for any reason other than death.

15.    <u>Actions Upon Termination</u>.    Upon termination of this Agreement as otherwise provided herein, if Employee is not continuing as an Employee or owner of Employer, the parties agree as follows:

(a)    Employer will make reasonable efforts to collect accounts receivable due to Employee's services for a period of sixty (60) days after such termination of employment. Within a reasonable period, generally fifteen (15) days, following the end of each month after termination during the collection period, Employer will submit to Employee an accounting of collections for Employee during the month and will pay to Employee sixty (60%) percent of such collections, retaining the remainder for administrative costs.

7

(b)    Employee agrees to maintain at his expense "tail" professional liability insurance coverage following his termination of employment, either by separate "tail" policy covering the Employer as to professional services performed by Employee during the term of this Agreement or by other coverage satisfactory to Employer, unless such coverage is determined by Employer to be unnecessary because of uninterrupted coverage of Employee with the same insurer. If Employee fails to provide proof of such coverage, Employer may obtain such coverage. Employer may offset any cost of obtaining such coverage against Employee's final salary payment,  bonus, if any, due Employee at the end of the calendar year or sums due Employee as a result of collections after termination.  To the extent such sums are insufficient to cover the obligations of Employee pursuant to this paragraph, Employee agrees to repay such sums to Employer.

(d)    Employee agrees that he will not directly or indirectly for a two (2) year period after such termination solicit patients of Employer, except for patients for whom Employee is designated on Employer's records as primary care provider, or provide information to any party concerning the patients or the patient list of Employer.

16.    <u>Working Facilities</u>.  Employee shall be furnished with an office, technical help, and such other facilities and services as required for the performance of his duties hereunder.

17.    <u>Other Benefits Provided by Employer</u>.  The Corporation does hereby agree to pay on behalf of or reimburse Employee for the following expenses during the term of and resulting from his employment under this Agreement:

(a)    All expenses incurred in the payment of premiums for professional liability insurance insuring Employee at the same level of coverage provided for all other physician employees of Employer;

8

      (b)     All expenses for membership dues to the Alabama and Montgomery County Medical Associations.

18.    <u>Automotive Transportation</u>.  Employee agrees to provide his own automotive transportation at Employee's sole cost and expense for the rendering of medical services to the public and for the benefit and convenience of the Employer.  Employee further agrees to maintain at his expense at all times public liability insurance coverage underwritten by an insurance company acceptable to Employer on all automobiles used by him in the performance of this contract in an amount of not less than $300,000/$500,000 coverage.

19.    <u>Record Keeping</u>.  If Employee fails to properly document patient records according to standards set forth by insurance companies, medicaid, medicare , or other payors, or takes other actions that result in fines, interest, liability or legal or accounting costs being incurred in connection with such actions or failure to keep proper records, Employee hereby agrees to indemnify Employer for all such fines, interest, liability or costs so incurred.

20.    <u>Personal Services Contract</u>.  This contract between Employer and Employee is for the personal services of Employee and shall not be the subject of any hypothecation, alienation or garnishment.

21.    <u>Case Records and Histories</u>.  All case records, case histories, X-ray films or personal and regular files concerning patients or patients consulted, interviewed or treated and cared for by Employee, shall belong to and remain the property of Employer unless otherwise requested by a patient.

9

22.    <u>Waiver of Breach or Violation Not Deemed Continuing</u>.  The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach thereof.

23.    <u>Governing Rules and Regulations</u>.  It is hereby mutually understood and agreed that the Articles of Incorporation and Bylaws of Employer, as amended from time to time, shall be considered part of this Agreement and executed copies of same shall be attached hereto and made a part hereof.

24.    <u>Authority</u>.  The provisions of this Agreement required to be approved by the Board of Directors of Employer have been so approved and authorized.

25.    <u>Governing Law</u>.  This Agreement shall be interpreted, construed and governed according to the laws of the State of Alabama.

26.    <u>Modification</u>.  This Agreement may not be amended, modified, altered or changed in any respect whatsoever, except by a further agreement in writing executed by the parties hereto.

27.    <u>Integration</u>.  This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the employment of Employee by Employer and contains all of the representations, covenants, and agreements between the parties with respect to such employment.

28.    <u>Paragraph Headings</u>.  The paragraph headings contained in this Agreement are for convenience only and shall in no manner be construed as a part of this Agreement.

29.    <u>Counterparts</u>.  This Agreement is executed in two (2) counterparts, each of which shall be deemed an original and together shall constitute one and the same Agreement.  One counterpart is delivered to each party hereto.

10

**IN WITNESS WHEREOF**, Employer has caused this Agreement to be executed by its duly appointed officers and its seal to be hereunto affixed, and Employee has hereunto set his hand and seal, all as of the 7th day of November , 2001.

ALABAMA FAMILY PRACTICE, P.C., an Alabama professional corporation

(SEAL)

By: _____
   Kathy Lindsey
As Its  President

ATTEST:                                                     EMPLOYER

_____
As Its Secretary

_____
W. Ryan McWhorter, M.D.

                                                          EMPLOYEE

**STATE OF ALABAMA**                   )
**COUNTY OF MONTGOMERY**               )

       I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that Kathy Lindsey, whose name as President of Alabama Family Practice, P.C., an Alabama professional corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, she, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation on the day the same bears date.

       GIVEN under my hand and official seal of office this 7th day of November, 2001.

_____
NOTARY PUBLIC
My Commission Expires: 01/31/2005

(S E A L)

11

**STATE OF ALABAMA**           )
**COUNTY OF MONTGOMERY**   )

       I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that W. Ryan McWhorter, M.D., whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, he executed the same voluntarily on the day the same bears date.

       GIVEN under my hand and official seal of office this _7th_ day of _November_, 2001.

                               NOTARY PUBLIC
                               My Commission Expires: _01/31/2005_

(S E A L)

12